No. 110,130

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellant*,

v.

MILES E. THEURER,
*Appellee*.


SYLLABUS BY THE COURT


1.

A sentencing court is required to impose the presumptive sentence provided by the Revised Kansas Sentencing Guidelines Act, K.S.A. 2013 Supp. 21-6815(a), unless the court finds substantial and compelling reasons to impose a departure sentence.


2.

A substantial and compelling reason to depart downward from a presumptive sentence is a mitigating factor. In order for a mitigating factor to be substantial, the reason must be real, not imagined, and of substance, not ephemeral. In order to be compelling, the mitigating factor must be one which forces the court, by the facts of the case, to abandon the status quo and to venture beyond the sentence that it would ordinarily impose.


3.

Although K.S.A. 2013 Supp. 21-6815(c)(1)(A)-(E) provides a list of potential mitigating factors, the list is nonexclusive, and a sentencing court may rely on nonstatutory factors to depart if they are consistent with the principles underlying the Revised Kansas Sentencing Guidelines Act.


1

4.

If a sentencing court determines that a departure sentence is warranted, it must state on the record at the time of sentencing the substantial and compelling reasons for the departure and make findings of fact regarding those mitigating factors. K.S.A. 2013 Supp. 21-6815(a); K.S.A. 2013 Supp. 21-6817(a)(4).

5.

An appellate court's standard of review for departure decisions depends on the issue presented. When we consider whether the record supports an articulated mitigating factor for a departure sentence, we review for substantial competent evidence. When the appellate court determines whether a particular mitigating factor may ever, as a matter of law, be substantial and compelling in any case, our review is unlimited. When the record supports a valid, articulated mitigating factor, we apply an abuse of discretion standard to determine whether the mitigating factor constituted a substantial and compelling reason to depart in the particular case.

6.

A departure sentence will be upheld on appeal if any of the mitigating factors or reasons articulated by the sentencing court is substantial and compelling given the particular case. Conversely, if each individual factor, standing alone, is not sufficient to justify a departure sentence, the factors, considered collectively, may constitute a substantial and compelling basis to impose a departure sentence in the particular case.

7.

Reasons which may in one case justify departure may not in all cases justify a departure. Rather, an appellate court must evaluate the offense of conviction, the defendant's criminal history, and the departure reason stated, as well as the purposes and principles of the Revised Kansas Sentencing Guidelines.

Appeal from Riley District Court; JOHN F. BOSCH, judge. Opinion filed November 21, 2014. Reversed, sentences vacated, and case remanded with directions.

*James W. Garrison*, assistant county attorney, *Barry R. Wilkerson*, county attorney, and *Derek Schmidt*, attorney general, for appellant.

*Pedro L. Irigonegaray* and *Elizabeth R. Herbert*, of Irigonegaray & Associates, of Topeka, for appellee.

Before BUSER, P.J., STEGALL, J., and BUKATY, S.J.

BUSER, J.: While driving under the influence of alcohol, Miles E. Theurer caused a head-on collision which killed Elizabeth Young and Michael Stanley. In keeping with a plea agreement, Theurer pled no contest to two counts of involuntary manslaughter while driving under the influence of alcohol. Under the Revised Kansas Sentencing Guidelines Act (RKSGA), K.S.A. 2013 Supp. 21-6801 *et seq.*, the district court was required to impose presumptive sentences of imprisonment. Instead, the district court sentenced Theurer to two concurrent 41-month sentences but granted his motion for dispositional departure sentences. As a result, Theurer was not imprisoned but was granted 36 months of probation while under house arrest with special conditions, including serving 60 days in jail.

We hold the sentencing court erred in four aspects when it granted Theurer's motion for dispositional departure sentences. First, as a general matter, the sentencing court based its sentencing decision on an error of law by applying an incorrect legal standard. Second, the overriding factor articulated by the sentencing court for granting a departure in this case—that the defendant is an exceptional person with the potential to provide a great benefit to society—is not a substantial and compelling reason to grant departure sentences. Third, some of the sentencing court's other articulated reasons for granting departure sentences were not supported by substantial competent evidence.

3

Fourth, those reasons enunciated by the sentencing court which were supported by substantial competent evidence, when considered together, did not provide a substantial and compelling reason to grant departure sentences given the circumstances of this involuntary manslaughter case.

Accordingly, we reverse the judgment of the sentencing court, vacate the sentences imposed, and remand the case to the district court with directions for resentencing.

FACTUAL AND PROCEDURAL BACKGROUND

On Saturday, May 12, 2012, Theurer received a bachelor of science degree in agriculture from Kansas State University (KSU). The following evening, Theurer and three friends celebrated the occasion by visiting the Mustang Gentlemen's Club, a Junction City strip club. Several hours later, in the early morning hours of Monday, May 14, 2012, with Theurer driving a Silverado pickup truck, the four men began the return trip to Manhattan.

Eyewitnesses described Theurer as driving erratically, too fast for the circumstances, and swerving on the roadway. At about 2:45 a.m., Theurer approached a construction zone on Fort Riley Boulevard/Highway K-18, with marked eastbound and westbound lanes. Although he was traveling eastbound, Theurer entered the westbound lane, driving in the wrong direction.

Ronnie Loggins, who had been following Theurer's truck and had properly entered the eastbound lane, flashed his headlights, honked his horn, and pulled next to Theurer, waving his arms in an effort to alert him that he was driving the wrong way. Theurer did not respond to these warnings but continued traveling eastbound at about 55 miles per hour in the westbound lane of the construction zone.

4

A short time later, Theurer's truck collided head-on with a westbound Buick LeSabre near Stagg Hill Road. The automobile was driven by Young, a 31-year-old mother of two children. The passenger was Stanley, a 30-year-old father of two children. Due to the force of the collision, the Buick went "almost straight up in[to] the air." The vehicle was totaled, with the front end "completely smashed."

Young and Stanley had "severe trauma" and were killed instantly. In an affidavit filed in support of the arrest of Theurer, Officer Calvin Sanders of the Riley County Police Department averred:

> "The coroner results indicated that Young 'expired as a consequence of overwhelming injuries with damage to the central nervous system that cause[d] . . . instant death' and both died as [a] result of 'atlanto-occipital separation.' This means that both had their necks broken at the skull with a tear of the spinal cord due to the impact of the collision."

Officer Sanders was dispatched to the collision. As he approached Theurer's truck, he "immediately smelled the odor of alcoholic beverage from inside the vehicle." When asked what happened, Theurer told the officer, "'In all honesty, I thought I was in the correct lane.'"

Theurer and his friends were seriously injured and taken to area hospitals. At Mercy Hospital, Theurer's blood was drawn for alcohol testing. At that time, he volunteered to Officer Sanders, "'I'll be honest; I'm not going to say I didn't have anything to drink.'" After waiving his constitutional rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), Theurer advised Officer Sanders that he had consumed two Bud Light beers at a bar. Theurer told the officer he had stopped drinking alcohol 30 minutes prior to leaving Junction City for Manhattan. When Theurer was asked if he believed he was under the influence of alcohol, he replied, "'I mean I just

5

had a couple.'" Theurer also said he did not notice anyone in a vehicle trying to get his attention before the collision.

Andrew Mason, a passenger in Theurer's truck, was later interviewed by Officer Sanders. According to Mason, the men went to the strip club at about 8 p.m. on Sunday and finished drinking about 30 minutes before leaving Junction City early Monday morning to return home to Manhattan. Mason claimed that prior to the collision Theurer drank one or two bottles of beer.

At the scene of the collision, Officer Sanders found in the passenger's compartment of Theurer's truck a Coors Light beer can, a "'Coors Light case,'" and a "'Maker's Mark liquor bottle.'" Theurer's blood sample was taken to the Kansas Bureau of Investigation laboratory for forensic testing. The results revealed that Theurer's blood-alcohol content was .19—more than twice the legal limit. See K.S.A. 2011 Supp. 8-1567(a)(2).

As a consequence of the collision, Lance Schmidt, a passenger in Theurer's truck, suffered a closed head injury which necessitated therapy at the Madonna Rehabilitation Hospital in Lincoln, Nebraska, in an effort to regain the use of his arms. Mason, also received physical therapy for his injuries. Joseph Iliff, another passenger in Theurer's truck, was also injured, and Theurer's right foot had been almost amputated as a result of the accident impact.

After the collision, Theurer attended classes at KSU through the summer and fall semesters of 2012. On April 9, 2013, the State charged Theurer with two counts of involuntary manslaughter while driving under the influence of alcohol, severity level 4 person felonies in violation of K.S.A. 2011 Supp. 21-5405(a)(3)—see K.S.A. 2011 Supp. 8-1567(a)(2)—and two counts of aggravated battery, severity level 5 person felonies, in

violation of K.S.A. 2011 Supp. 21-5413(b)(2)(A), for the injuries sustained by Schmidt and Mason. Theurer surrendered to authorities, and he was released on bond.

On May 7, 2013, in keeping with a plea agreement, Theurer entered pleas of nolo contendere to two counts of involuntary manslaughter. In return, the State dismissed the aggravated battery charges and promised not to file additional charges related to the collision. The State also agreed to recommend that Theurer serve the standard presumptive RKSGA prison sentence for each of the involuntary manslaughter convictions. The sentences were to run concurrent with one another. If followed by the sentencing court, the State's recommendations meant that Theurer would serve 41 months in prison. See K.S.A. 2011 Supp. 21-6804(a). In keeping with the plea agreement, however, Theurer reserved the right to request a departure from serving the presumptive prison sentences. After being informed of the plea agreement, District Judge John F. Bosch accepted the pleas and found Theurer guilty of two counts of involuntary manslaughter.

After the plea hearing, Theurer filed a motion for downward durational and dispositional departure sentences. He identified 17 mitigating factors as substantial and compelling reasons to depart from the presumptive RKSGA sentences of imprisonment: (1) Theurer's "unlawful conduct was aberrant behavior"; (2) Theurer "has provided extraordinary acceptance of responsibility"; (3) Theurer "has no criminal history," and is "relatively young and a very good candidate for continued rehabilitation"; (4) Theurer has "Type 1 diabetes, . . . currently uses an insulin pump," and takes medication for high blood pressure; his diabetes is difficult to stabilize and needs close monitoring, which is "expensive and requires specialized professional care," including seeing a "specialist 2-3 times per year"; (5) Theurer "maintained a 4.0 GPA during high school" and "participated in numerous extra-curricular organizations"; (6) Theurer completed his bachelor's degree and "[d]uring his undergraduate years [he] continued to be an outstanding student, maintaining a 3.722 GPA, and participating in many extra-curricular programs," and thus

he "has played an active and positive role in the community throughout his education"; (7) Theurer "currently has two academic years remaining in his pursuit of two post-graduate degrees" in veterinary medicine and "Diagnostic and Pathology Medicine"; (8) Theurer "is currently involved in a research project that has the long term potential to increase profitability in the beef industry, and reduce the use of antibiotics on food animals"; (9) Theurer "is currently developing an Antimicrobial Resistance Seminar that will bring both medical and veterinary professionals together" and "be beneficial to the treatment and control of a variety of diseases"; (10) Theurer "was a founding member of the Food For Thought Organization," a "grass-roots group . . . started by students coming together to discuss ways to meet the challenges of misconceptions about an agricultural industry removed from urban consumers"; (11) Theurer "has accumulated approximately $102,000 in outstanding student loans," and "[s]ociety benefits from these loans being repaid"; (12) Theurer "wishes to continue his education after sentencing so that he may reach his potential and do the maximum amount of good for society"; (13) Theurer "has already begun the rehabilitation process" by completing a "course of drug and alcohol awareness, and has begun the process of completing an Alcohol Evaluation through Pawnee Mental Health Care Services"; (14) Theurer "has on numerous occasions told others about the terrible mistake he made the night of the accident," he "has shared with others the tragic consequences that occurred due to his poor judgment in deciding to get behind the wheel after consuming alcohol," he "recognizes that he is not the first, or likely the last, person who will make this mistake," and he "has contacted the administrators of several institutions seeking the opportunity to share his story and the lessons that he has learned with young students"; (15) Theurer "is fortunate to have a caring and supportive family, including his father, mother, and two older brothers, to whom he is very close" and who "have continued their support for him through this difficult time in his life"; (16) Theurer "has numerous friends that continue to support him"; and (17) Theurer "has also developed an extensive network of professionals and academics who believe that society would benefit from a departure from the sentencing guidelines [in this case]."

8

In support of his departure motion, Theurer provided academic transcripts, descriptions of his current educational projects, a breakdown of his student loan debt, a certificate of completion from an on-line alcohol and drug awareness course, letters expressing interest in hearing him speak about drunk driving, and over 100 letters submitted as character references.

In his departure motion, Theurer proposed that instead of the district court imposing the presumptive sentences of imprisonment, the court should impose an "'alternative' or 'unique' sentence":

> "Mr. Theurer proposes a sentence that, if probation alone is insufficient, would combine probation and house arrest during the school year with incarceration of some kind (potentially the Riley County Jail) during any time off from his academic program that he may otherwise enjoy. The court could prevent Mr. Theurer from attending social events, parties, restaurants, movie theatres, and any and all other recreational activities. Mr. Theurer does request however, that he be allowed to fulfill his obligations stemming from his proposals to local institutions to warn students and members of the dangers of drinking and driving, that he be allowed to complete his academic requirements, and that he be allowed to receive the necessary medical care. At the conclusion of Mr. Theurer's academic program, house arrest could be continued as long as the court may deem just and appropriate. This option allows [him] to do the maximum amount of good for society, while paying his debt to the same."

A presentence investigation (PSI) report was prepared to assist the sentencing court. In this report, Theurer was asked to provide his version of the crimes of conviction. Theurer wrote: "I made a mistake. I consumed alcohol and I drove my vehicle. I am truly sorry for all consequences."

The PSI report also included statements written by family members of Young and Stanley. Stanley's father wrote that he had a mental breakdown after "losing my only child, my boy, my son." The father said he could not work for 7 weeks and fell behind on

9

his payments, including his house payments. He described how his son's own children, 11 and 9 years old, were now fatherless. Stanley's father observed that Theurer "still get[s h]olidays and [b]irthdays," but that his own family has only memories.

Stanley's stepmother wrote that "with [Stanley] gone it seems the world is a darker place" and "[t]here is a void that can't be healed." She said she had "watched my family fall apart" and that her husband "has lost his zest for life." She described how Stanley's daughter "took all his clothes clean and dirty [and] put them in 1 big bag so she can keep his scent forever." She described how Stanley's son "became suicidal, talking about taking his own life just to be in the box with his Dad."

Stanley's daughter wrote: "I'm really sad . . . . I will never hear or feel him pick me up and swing me around [and] sing to me." She said Stanley "played silly games, gave piggy back rides, [and] rode my [tricycle] to make me laugh. . . . We had tea [parties], watch[ed] movies together." She said: "He will miss all my school events, sports events, . . . never see me graduate or go to college, never see me get married or be there to give me away, never hold my babies or be a grandpa like [P]apa."

Stanley's son wrote: "I want my Daddy, but he's never coming home again." The boy said: "I wanted to die to be with him" and that "I had to see a special doctor. I now take [medicine] to help me." He also said: "I know I can't hurt myself, 'cause then [N]ana would die if I died."

Stanley's mother wrote that the "loss of my son has impacted me greatly." She "had to increase [her] medications" to the maximum dose and yet still has "a hard time getting motivated" and "concentrating at work." She stated she would "'start to cry, and can't stop'" and also said: "'I don't think that anyone can ever understand how the loss of a child impacts a person's life.'" Other relatives of Stanley also submitted written statements.

10

Judge Bosch presided over the sentencing hearing which occurred on June 17, 2013. In addition to considering the departure pleadings, PSI report, drug and alcohol evaluation report, and written victim impact statements, the sentencing court listened to personal statements made at the hearing.

Stanley's stepmother mentioned at sentencing that Stanley's daughter "looks for her daddy at night. She gets up, walks through the house, walks up to her dad, stands there and talks to him." She said Stanley's son "was having breakdowns in the classroom, crying uncontrollably," and "has been under counseling heavily for a whole year."

A letter was read from Young's daughter, who was also present at sentencing. She detailed numerous personal activities and anticipated events of her life which her mother would never share. Speaking also for her younger brother in the letter, she said: "[W]e were both completely robbed of everything that could have happened in the future."

Finally, Stanley's father, referring to Theurer's proposal to make speeches about drunk driving, said, "Well, that's a good idea, but I think he should get the full effect of it, of going and doing his time and then coming back and helping kids so he can tell them what to expect." It is noteworthy that all of the statements from the victims' families emphasized the need for Theurer to serve a prison sentence for his crimes.

At the sentencing hearing, Theurer also addressed the court. Theurer apologized to the families of Young and Stanley, especially the victims' children. He apologized also "to the passengers that were in my vehicle that night of the accident," to "the community, to the officers and emergency personnel that responded to the scene," to his "family and friends," and to the "judge, as representative, as the State of Kansas judicial system, for having to take the time and effort to process the case before you."

11

Theurer asked the sentencing court "to grant the downward departure to allow me the opportunity to talk to the high school, college, [and] professional students, [and to] explain the true consequences and their effects of drinking and driving." Theurer said his "goal . . . is to explain the nightmare that I have been through, so they will not make the same tragic, dumb mistake that I made that evening." Theurer said, "While there's no amount of money I could pay, time I could serve, community service that I can do to ever repay my debt to society," he could "still be a positive influence on society and help people from making some of these same tragic mistakes in the future."

During the hearing, the sentencing court quoted extensively from character reference letters written in support of Theurer. These letters were written by Theurer's friends, fellow students, former teachers, KSU faculty and administrators, and individuals associated with agriculture, including the Kansas Secretary of Agriculture.

At the hearing, the sentencing court made several factual findings and legal conclusions. It found that Theurer had a low risk of reoffense based on a Level of Service Inventory Test (LSI-R test) and the Pawnee Mental Health Care Services drug and alcohol assessment which showed a "low probability that Mr. Theurer has a substance dependence disorder." The sentencing court also found that Theurer was remorseful and had no criminal history, including "no evidence that he has ever broken the law before." It made findings regarding Theurer's diabetes and his use of an insulin pump. Additionally, the district court found Theurer has a supportive family and a "[g]ood" employment and education record. It found Theurer had engaged in "rehabilitation efforts" by staying in school, pursuing his degree, and presenting "a proposal that . . . instead of sitting in prison for the next three years . . . he go out into society to high schools, to colleges, to universities, to whoever, and tell them his story, to educate them." Finally, the sentencing court found Theurer was not a threat to public safety, and he had accepted responsibility for his crimes.

Judge Bosch granted Theurer's motion for dispositional departure sentences. In ruling from the bench, the district judge extensively addressed what he considered were Theurer's exceptional personal characteristics:

"Mr. Theurer would be, and it's been proposed, an excellent person to speak. People have described him in the letters as an 'impactful speaker' with the 'ability to capture an audience.' He's 'well-spoken.' He will 'be an advocate against drunk driving' if allowed to speak. 'When he speaks, people listen.' 'The mothers and fathers of the thousands lives he can reach through speaking engagements will be grateful.' He could 'share his story throughout the nation.' He is an 'articulate, convincing speaker.' Basically, other than this incident, which has been described as aberrant behavior, Mr. Theurer has led a rather perfect life, in spite of the fact he's diabetic, in spite of the fact he could not play sports, which might account for why he has been so involved in things. I don't think there was a thing in high school he wasn't involved in. I don't think there was a thing in college that he wasn't involved in.

"One of his professors . . . indicated in the past 10 years, as long as this professor has been teaching, there's not been another person who has been more involved than Mr. Theurer. . . .

. . . .

"I don't believe any of the factors that I have mentioned, Mr. Theurer, standing alone, would justify a downward departure. But I can't imagine a situation where we have—I ever have someone come before me again where they have done everything that society expects to be done by a person except for this one thing.

"You have been described as, you know, a role model to children, described as a stellar student, as a star student. It's too many to cover, *but you are an exceptional person that I find to be an atypical case*. And in this case that, when considering the totality of all of the facts of your life up to this point, I find that you should be granted a downward departure and that there are substantial, compelling reasons when considered in all their totality. . . .

"So what the Court will do for a sentence is I will require that you serve as much time in the Riley County Jail as I can when I place you on probation, which is 60 days. . . . You will be placed on 36 months of probation with the Court Service Officer for Riley County . . . . And for you to use your God-given talents, and if you can reach

13

one person it will be worth it during those 36 months. I have no doubt that maybe you can do the same thing if you spent that time in prison, but I don't know.

"What I think is best for society is that you get your degree, that you realize that you have a lot of good to do with your life, not just for yourself, but you have, really, three people's lives on your shoulders. You have everything that Mr. Stanley would have done good, everything that Elizabeth Young could have done during their lifetime. And you're going to have to make up . . . , to society, what you've done. And I think this might be a start where, if you do as I think you can, as *you are such an atypical, such a unique person with such skills*, that I think maybe you can touch some people out there. And so the 60 days you're sitting in jail, I want you to put together a written proposal for how you are going to do what you say you can do. And . . . I'm going to order that during the 36 months that you are on probation that you talk to no less than 36 either high schools, colleges, [or] church groups.

". . . And if you can get—reach through to one person and save one life or make an impact on one person, then I think that that is the better thing for society." (Emphasis added.)

After the hearing, the sentencing court summarized its reasons for ordering the departure sentences in its journal entry of judgment:

"*Court finds Defendant an a-typical case*. Totality of circumstances of factors listed on the record include:  good grades in school, lack of criminal record, diabetic medical condition, Defendant's good character, Defendant's good speaking ability, [and] Defendant's letters of recommendation are substantial and compelling reasons to depart." (Emphasis added.)

The State filed a timely appeal of the district court's granting of departure sentences.

14

On appeal, the State first contends the sentencing court "did not apply the correct policy standards when considering whether there [were] substantial and compelling reasons to grant a dispositional departure." The State also maintains the sentencing court's "reasons as a whole for departure were not substantial and compelling reasons to depart in this case." In response, Theurer maintains the sentencing court "addressed appropriate evidence within the scope of the statutes and in furtherance of the purpose and principals of the guidelines."

KANSAS LAW REGARDING DEPARTURE DECISIONS AND APPELLATE REVIEW

We begin with a summary of Kansas law applicable to departure decisions and our standards of appellate review. "[T]he sentencing judge shall impose the presumptive sentence" provided by the RKSGA unless the judge finds "substantial and compelling reasons to impose a departure sentence." K.S.A. 2013 Supp. 21-6815(a). If the sentencing court determines that a departure is warranted, it must "state on the record at the time of sentencing the substantial and compelling reasons for the departure" and make findings of fact as to those reasons. K.S.A. 2013 Supp. 21-6815(a); K.S.A. 2013 Supp. 21-6817(a)(4). When there is a conflict between the reasons articulated in the written journal entry and those provided by the sentencing court at the hearing: "'The court's comments at the time of sentencing, not the written journal entry, govern as to the reasons for departure.' [Citations omitted.]" *State v. Spencer*, 291 Kan. 796, 811, 248 P.3d 256 (2011).

A departure sentence will be upheld on appeal if any of the mitigating factors articulated by the sentencing court is substantial and compelling. *State v. Bird*, 298 Kan. 393, 398, 312 P.3d 1265 (2013). Conversely, each individual factor need not be sufficient, standing alone, to justify the departure sentence if the reasons collectively

constitute a substantial and compelling basis for departing from the presumptive sentence. 298 Kan. at 398.

A substantial and compelling reason to depart downward from the presumptive sentence is a "'mitigating factor.'" K.S.A. 2013 Supp. 21-6803(n). K.S.A. 2013 Supp. 21-6815(c)(l) contains a nonexclusive list of five mitigating factors, which a district court may consider when determining whether substantial and compelling reasons exist for a departure sentence. Sentencing courts may also consider nonstatutory factors "'as long as there is evidence in the record to support such factors and the use of the factors would be consistent with the intent and purposes of the sentencing guidelines.' [Citations omitted.]" *State v. Hines*, 296 Kan. 608, 616, 294 P.3d 270 (2013). A sentencing court's use of statutory factors should not be reviewed with greater deference than a decision to rely upon nonstatutory factors, and the use of nonstatutory factors should not be subjected to stricter scrutiny. *State v. Martin*, 285 Kan. 735, 747, 175 P.3d 832 (2008).

The standard of appellate review of a departure sentence depends on the question raised. An appellate court applies a substantial competent evidence standard when the question on appeal is whether the record supports the particular reasons for departure articulated by the sentencing court. *Bird*, 298 Kan. at 397. Substantial competent evidence is evidence possessing both relevance and substance that a reasonable person could accept as being adequate to support a conclusion. *State v. May*, 293 Kan. 858, 862, 269 P.3d 1260 (2012). Appellate review is de novo, however, when the question involves making a determination whether a particular mitigating factor found by the sentencing court "can '*ever*, as a matter of law, be substantial and compelling in *any* case.'" *Bird*, 298 Kan. at 397-98. Finally, when the record supports the reasons behind the departure and those reasons are legally valid, an appellate court utilizes an abuse of discretion standard to decide whether the sentencing court based its conclusion that substantial and compelling reasons warranted a departure upon a proper weighing of the mitigating

16

factors. 298 Kan. at 398; *State v. Rochelle*, 297 Kan. 32, 45-46, 298 P.3d 293, *cert. denied* 134 S. Ct. 270 (2013).

A judicial action, such as a sentencing court's decision to grant dispositional departure sentences, constitutes an abuse of discretion

> "if [the] judicial action (1) is arbitrary, fanciful, or unreasonable, *i.e.*, if no reasonable person would have taken the view adopted by the trial court; (2) is based on an error of law, *i.e.*, if the discretion is guided by an erroneous legal conclusion; or (3) is based on an error of fact, *i.e.*, if substantial competent evidence does not support a factual finding on which a prerequisite conclusion of law or the exercise of discretion is based." *State v. Ward*, 292 Kan. 541, Syl. ¶ 3, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012).

If an appellate court concludes the sentencing court's "factual findings are not supported by the evidence in the record or do not establish substantial and compelling reasons for a departure," the appellate court must "remand the case to the [sentencing] court for resentencing." K.S.A. 2013 Supp. 21-6820(f).

Finally, to the degree we must interpret the governing Kansas statutes, our review is unlimited. See *State v. Andry*, 295 Kan. 733, 735, 286 P.3d 207 (2012).

KANSAS LEGISLATIVE POLICY AND LEGAL STANDARDS REGARDING SENTENCING

We begin with the State's argument regarding what it calls "policy standards," meaning legal standards relating to sentencing established by the Kansas Legislature as a matter of public policy. The State contends the sentencing court "did not apply the correct policy standards when considering whether there [were] substantial and compelling reasons to grant a dispositional departure." In the State's view, this error is shown, in part, by the sentencing court's citing and quoting from an inapplicable statute, K.S.A. 2013 Supp. 21-6601, at the beginning of its ruling. In citing this statute, the State maintains the

17

sentencing court erroneously stated that Kansas sentencing statutes should be liberally construed to focus on a defendant's "'characteristics, circumstances, needs and potentialities . . . .'" See K.S.A. 2013 Supp. 21-6601.

In response, Theurer concedes that "[t]he State's technical contention is accurate: the departure statutes do not fall within the range of statutes to which the quoted language applies." But Theurer contends the correct statutory language, K.S.A. 2013 Supp. 21-6802(a) and (b), "does not remove all discretion from the trial court to consider individual characteristics as the State suggests."

At the beginning of the hearing, the sentencing judge said he would determine Theurer's sentences

> "in light of the statute *that requires how courts are to construe the sentencing statutes*.
>     "And I'm just going to quote from the statute: It says—it makes it clear—K.S.A. 21-6601—Legislative policy to be followed is to be *liberally construed* to the end that persons convicted of crimes shall be dealt with in accordance with the *individual characteristics, circumstances, needs, and potentialities* as revealed by case studies; that dangerous offenders be correctly treated in custody for long terms as needed; and that other offenders shall be dealt with by probation, suspended sentence, fined, or assignment to a community correctional service program whenever such disposition appears practicable and not detrimental to the needs of public safety and the welfare of the offender." (Emphasis added.)

The State highlights the sentencing court's omission of the opening clause of the statute: "*K.S.A. 2013 Supp. 21-6601 through 21-6629, and amendments thereto*, shall be liberally construed . . . ." (Emphasis added.) K.S.A. 2013 Supp. 21-6601.

On appeal, both parties agree the sentencing court erred because K.S.A. 2013 Supp. 21-6601 did not pertain to the sentencing statutes in this case. Although Theurer

18

argues the error was "technical," we disagree. A brief historical review reveals that K.S.A. 2013 Supp. 21-6601 reflects an earlier, different sentencing policy from that which currently is found in the Revised Kansas Sentencing Guidelines Act (RKSGA) K.S.A. 2013 Supp. 21-6801 *et seq.*, and its predecessor, the Kansas Sentencing Guidelines Act (KSGA), K.S.A. 21-4701 *et seq.*

The language now found in K.S.A. 2013 Supp. 21-6601 was first enacted in 1969 as part of a general recodification of Kansas criminal law. See K.S.A. 21-4601 (Weeks); L. 1969, ch. 180, sec. 21-4601. The 1969 version of the statute began by stating: "*This article* shall be liberally construed . . . ," meaning article 46, which was the article controlling sentencing. (Emphasis added.) See K.S.A. 21-4601; L. 1969, ch. 180, sec. 21-4601. The statute still began this way in 1992 when the KSGA was enacted, but the KSGA was set out in a *new* article 47, K.S.A. 21-4701 *et seq.*, again demonstrating the inapplicability of the statutory language quoted by the sentencing court to the sentencing guidelines in Kansas. See, *e.g.*, K.S.A. 21-4701; K.S.A. 21-4702; L. 1992, ch. 239, secs. 1-2.

Sentencing under the 1969 Kansas Criminal Code was *indeterminate*, meaning "[d]iscretion was vested in the sentencing judge to establish the minimum and maximum term of the sentence, within the limits set by the statute." *State v. Van Winkle*, 256 Kan. 890, Syl. ¶ 9, 889 P.2d 749 (1995); see *White v. Bruce*, 23 Kan. App. 2d 449, 453, 932 P.2d 448 (distinguishing "pre-guidelines indeterminate sentence" from "a new guidelines determinate sentence") *rev. denied* 262 Kan. 970 (1997). Indeterminate sentencing reflected a legislative policy shifting "the balance toward rehabilitation as the primary goal of sentencing." Note, *Sentencing Felons to Imprisonment Under the Kansas Criminal Code*: *The Need For a Consistent Sentencing Policy*, 10 Washburn L.J. 269, 273 (1971). "As a necessary prerequisite to a correctional program aimed at rehabilitating the offender," it was "essential that the sentence be tailored to the offender." 10 Washburn L.J. at 273. Thus, the legislature enacted the language now found in K.S.A.

2013 Supp. 21-6601, directing liberal construction of sentencing statutes "to the end that persons convicted of crime shall be dealt with in accordance to their *individual* characteristics, circumstances, needs, and potentialities . . . ." (Emphasis added.) K.S.A. 21-4601; L. 1969, ch. 180, sec. 21-4601; see 10 Washburn L.J. at 273.

Importantly, however, the Kansas Legislature eventually reappraised its "departure from the traditional pattern of equating sanctions with the crime." 10 Washburn L.J. at 273. In 1989, the legislature created the Kansas Sentencing Commission (KSC) and directed it to "develop a sentencing guideline model or grid based on fairness and equity . . . . The sentencing guideline model or grid shall establish rational and consistent sentencing standards which reduce sentence disparity, to include, but not be limited to, racial and regional biases which may exist under current sentencing practices." K.S.A. 1989 Supp. 74-9101; L. 1989, ch. 225, sec. 1.

The KSC submitted its report to the legislature on January 15, 1991. See *State v. Soler*, 25 Kan. App. 2d 1, 6, 957 P.2d 516 (1998). Among the goals of the proposed guidelines were not only to "ensure the elimination of any racial, geographical or other bias that may exist," but also to "establish sentences that are *proportional to the seriousness of the offense and the degree of injury to the victim*." (Emphasis added.) Recommendations of the Kansas Sentencing Commission, ch. 1, p. 2 (January 15, 1991). The KSC noted that "[*m*]*aking the punishment proportional to the crime* is a key ingredient in guidelines systems. This concept involves the development of a hierarchy of harms that result from different levels of criminal activity. Once this ordering process takes place, guideline sentences ensure that *the punishment fits the harm*." (Emphasis added.) Recommendations of the Kansas Sentencing Commission, ch. 1, p. 3. The KSC also stated: "Like proportionality, fairness is a key concept. . . . *When factors external to the crime come into play, punishment may become a function of employment status, marital status, amount of education, or a subjective assessment of one's chances for*

20

*rehabilitation.*" (Emphasis added.) Recommendations of the Kansas Sentencing Commission, ch. 1, pp. 3-4.

In 1992, as previously noted, the Kansas Legislature adopted the sentencing guidelines approach by enacting the KSGA. Notably, the KSGA strongly emphasized the characteristics of the crime or case rather than the characteristics of the individual defendant: "The sentencing guidelines . . . shall apply equally to all offenders in all parts of the state, without discrimination as to any element that does not relate to the crime or the previous criminal record of the defendant." K.S.A. 21-4702; see generally *State v. Favela*, 259 Kan. 215, 233-34, 911 P.2d 792 (1996).

In 2007, the legislature created the Kansas Criminal Code Recodification Commission (KCCRC) to recodify the Kansas Criminal Code generally. See K.S.A. 21-4801; L. 2007, ch. 197, sec. 8. Following the KCCRC's recommendations, the RKSGA restates the KSGA's direction that the sentencing guidelines "shall apply equally to all offenders in all parts of the state," but it omits the prior language forbidding discrimination as to any element that does not relate to the crime. K.S.A. 2013 Supp. 21-6802(a); Kansas Criminal Code Recodification Commission, Final Report, Appendix A, p. 382 (December 16, 2010) (http://www.kansasjudicialcouncil.org/Resources.shtml).

The RKSGA also directs that "[t]he sentencing court may consider in all cases a range of alternatives with gradations of supervisory, supportive and custodial facilities at its disposal so as to permit a sentence *appropriate for each individual case*, consistent with these guidelines and the permitted dispositional and durational departures contained in [this Act]." K.S.A. 2013 Supp. 21-6802(b). These changes appear to reflect a more balanced, case-based view of sentencing, in line with the KCCRC's recommendation that a sentence should "enhance public safety through deterrence of future criminal action, . . . rehabilitate the offender, and . . . appropriately punish [the offender] for committing the offense." Kansas Criminal Code Recodification Commission, Final Report, p. 28.

21

One should not mistake the RKSGA's continued emphasis on the individual criminal *case*, meaning the facts surrounding the crime, with the personal characteristics of the individual *defendant*, wholly apart from the case. See K.S.A. 2013 Supp. 21-6802(a)-(b). Indeed, a review of the RKSGA's nonexclusive mitigating factors which may be considered by the sentencing court in making a departure decision underscores the importance the legislature has placed on the individual facts of the particular criminal case.

The RKSGA repeats verbatim the nonexclusive list of mitigating factors from the KSGA. See K.S.A. 2013 Supp. 21-6815(c)(1)(A)-(E); K.S.A. 21-4716(c)(1)(A)-(E). The State correctly argues that these factors show a legislative policy to "address circumstances, behaviors, and facts *within the case*" rather than "a Defendant's individual characteristics outside . . . the case" itself. (Emphasis added.)

K.S.A. 2013 Supp. 21-6815(c)(1)(A)-(E) provides:

"(c)(1)Subject to the provisions of subsections (c)(3) and (e), the following nonexclusive list of mitigating factors may be considered in determining whether substantial and compelling reasons for a departure exist:

(A) The victim was an aggressor or participant *in the criminal conduct associated with the crime of conviction*.

(B) The offender played a minor or passive role *in the crime or participated under circumstances of duress or compulsion*. This factor may be considered when it is not sufficient as a complete defense.

(C) The offender, because of physical or mental impairment, *lacked substantial capacity for judgment when the offense was committed*. The voluntary use of intoxicants, drugs or alcohol does not fall within the purview of this factor.

(D) The defendant, or the defendant's children, suffered a continuing pattern of physical or sexual abuse by the victim of the offense and *the offense is a response to that abuse*.

22

(E) *The degree of harm or loss attributed to the current crime of conviction* was significantly less than typical for such an offense." (Emphasis added.)

These five statutory mitigating factors listed in the RKSGA plainly relate to the unique facts and circumstances of a particular criminal case. Moreover, when referring to a behavior or characteristic of the particular criminal defendant or victim, the mitigating factors focus on those behaviors and characteristics as they relate to or impact the commission of the particular crime.

We believe the legislative policy set forth in K.S.A. 2013 Supp. 21-6802(a) and (b), and exemplified by the statutory mitigating factors listed in K.S.A. 2013 Supp. 21-6815(c)(1), is in sharp contrast to the sentencing court's approach in this case which mistakenly grounded its decisionmaking based on an inapplicable statute, K.S.A. 2013 Supp. 21-6601. This error of law caused the sentencing court to mistakenly fixate on the personal qualities and characteristics of Theurer unrelated to the defendant's deplorable criminal conduct which caused the deaths of Young and Stanley.

The sentencing judge's approach was best summarized by his statement to Theurer at sentencing that "you are an exceptional person that I find to be an atypical case." This finding was also repeated in the journal entry of judgment: "Court finds Defendant an a-typical case." In essence, for the sentencing court, Theurer *was* the case. The sentencing court's departure decision was reducible to a single overriding consideration wholly apart from the egregious facts and circumstances of this involuntary manslaughter case: Theurer was an "exceptional person."

Not only did the sentencing court's error of law mistakenly cause it to focus on Theurer as an exceptional person, without appropriate consideration given to the particular facts and circumstances of his involuntary manslaughter convictions, the

23

sentencing court's finding of exceptionalism was predicated on the notion that Theurer had the potential to be of great benefit to society.

The sentencing judge told Theurer:

"[T]he totality of all of the facts of your life up to this point, . . . [provided] substantial [and] compelling reasons when considered in their totality.

. . . .

"What I think is best for society is that you get your degree, that you realize that you have a lot of good to do with your life . . . . I think this might be a start where, if you do as I think you can, as you are such an atypical, such a unique person with such skills, that I think maybe you can touch some people out there."

On appeal, Theurer highlights the character reference letters which focus

"on the cost to society that would occur from [Theurer] being incarcerated rather than fulfilling his promise, and specifically many of the authors urged the court to fashion a sentence that would allow [Theurer] to complete his degrees so that he could go on to be of significant benefit to society."

Theurer was deemed to be an exceptional person meriting dispositional departure sentences because, in large measure, he exhibited the potential to perform extraordinary good work in society. But the fact that a defendant has the potential to be of great benefit to society is not a statutory mitigating factor justifying a departure sentence. Moreover, we know of no caselaw wherein such a reason was found by a Kansas appellate court to be a nonstatutory mitigating factor.

Of course, a nonstatutory factor may be employed by a sentencing court if the use of the factor is consistent with the intent and principles of the sentencing guidelines. *Bird*,

298 Kan. at 399. Our Supreme Court has recently identified some of the underlying principles of the sentencing guidelines:

> "[I]ncarceration should be reserved for serious/violent offenders who present a threat to public safety; *sanctions should be imposed based on harm inflicted*; sanctions should be uniform and not related to socioeconomic factors, race, or geographic location; penalties should be clear so as to be understood; individuals should not be sent to prison solely to gain education or job skills; and the system must be rational to allow policymakers to allocate resources. [Citation omitted.]" (Emphasis added.) 298 Kan. at 399.

Moreover, our Supreme Court has recognized three legislative purposes of the sentencing guidelines:  "(1) to reduce prison overcrowding; (2) to protect public safety, and (3) to standardize sentences so *similarly situated offenders are treated the same*." (Emphasis added.) 298 Kan. at 399.

There is nothing in the statutory language of the RKSGA which suggests that a criminal defendant who is an exceptional person based on a potential to benefit society merits a finding of mitigation. Moreover, the use of this factor is inconsistent with the intent and principles of the sentencing guidelines. Indeed, the sentencing guidelines would mean little if the punishment did not fit the crime and similarly situated offenders were treated unequally because a sentencing court formulated a judicial calculus of each criminal defendant's social usefulness. If this factor was considered, wide sentencing disparities would obviously result among defendants of greater or lesser talents, social and economic status, and personality traits. Accordingly, we hold that a sentencing court's finding that a defendant is an exceptional person with the potential to provide a great benefit to society is not a substantial and compelling reason to grant a departure sentence under the RKSGA.

The sentencing court's failure to follow the applicable legal standards, K.S.A. 2013 Supp. 21-6802 and K.S.A. 2013 Supp. 21-6815(c)(1)(A)-(E), resulted in the district

court's erroneous, laser-like focus on Theurer as an exceptional person potentially capable of benefitting society rather than assessing whether departure sentences were "appropriate for [this] individual case." See K.S.A. 2013 Supp. 21-6802(b). This, in turn, resulted in the sentencing court's mistaken conclusion that Theurer's exceptionalism was a valid nonstatutory mitigating factor that warranted departure sentences. Accordingly, we hold the sentencing court, by failing to apply the correct legal standards when considering Theurer's sentences, and by applying an invalid nonstatutory mitigating departure factor, abused its discretion by basing its judicial decision on errors of law. See W*ard*, 292 Kan. 541, Syl. ¶ 3.

### INDIVIDUAL REASONS CITED BY THE SENTENCING COURT FOR GRANTING DEPARTURE SENTENCES

We now turn to the other reasons or factors found by the sentencing court which, considered collectively, resulted in its ruling that Theurer was deserving of durational departure sentences. In keeping with our standard of review, we first examine whether each of the sentencing court's individual reasons for departure was supported by substantial competent evidence. Next, because the sentencing court found that, standing alone, none of the individual reasons were substantial and compelling, we consider if the separate factors which were supported by substantial competent evidence, considered together, constitute substantial and compelling reasons to depart under the particular facts of this case.

*Diabetic Condition*

In his departure motion, Theurer explained that incarceration may have "a significant negative impact on his health" because his Type 1 diabetes is "difficult to stabilize, and requires close monitoring." The existence of Theurer's diabetic condition was uncontroverted, and he currently uses an insulin pump. The sentencing court asked rhetorically, "Is Mr. Theurer's diabetes a factor that would require departure? Kansas law

26

is clear it's not in and of itself. But a defendant's poor health is related to a defendant's amenability to incarceration. . . . [I]t's not a sufficient factor, but it is one that can be considered with others." In context, then, the sentencing court found the presumptive sentences of imprisonment would adversely affect Theurer's diabetic condition.

On appeal, the State protests "there was not substantial competent evidence to support the district court's conclusion that [Theurer] had poor health that should prevent him from serving prison time." Theurer responds that his diabetes was a "nearly life-long condition" and it was a "struggle to stabilize it."

Without deciding whether diabetes may constitute, in an appropriate case, a valid mitigating departure factor, we consider whether there was substantial competent evidence to support the sentencing court's finding that imprisonment would adversely affect Theurer's medical condition. At the sentencing hearing, the State called Viola Riggin, the Director of Healthcare for the Kansas Department of Corrections (KDOC), to testify. Riggin said approximately 500 to 800 inmates have diabetes and that several hundred have the same Type 1 diabetes as Theurer. Riggin said 12 of these inmates use an insulin pump.

Riggin testified that the State contracts with Correct Care Solutions (CCS) to manage inmate healthcare. According to Riggin, since the KDOC is required to "provide healthcare at any and all levels . . . to maintain the community standard of care," an inmate essentially receives the same care as other nonincarcerated citizens. She said, "[I]t's the same as the first floor of any hospital. We have OB/GYN, oncology, dialysis on site, [endocrinologists, and] family practitioners on site, so we handle anything that we need to."

Substantial competent evidence did not show Theurer was too ill to be imprisoned or that the KDOC was unable to effectively treat his diabetes. Other than Theurer's mere

27

assertion that his diabetic condition would negatively impact him in prison, Theurer, who did not testify, did not offer any evidence demonstrating that his diabetic condition distinguished him from other felony offenders who suffer from very serious health conditions while serving their time in prison.

On the other hand, the sentencing court's finding that Theurer's diabetes adversely affected his amenability to incarceration was directly contradicted by Riggin's testimony which established that KDOC is fully equipped to provide Theurer with any necessary medical treatment. Moreover, Riggin also testified that in the event the KDOC cannot meet an inmate's medical needs on site, the inmates are "taken to outside specialists in the community."

We conclude the sentencing court's finding that imprisonment would adversely affect Theurer's diabetic condition was not supported by substantial competent evidence and, therefore, should not have been considered as a mitigating factor in this case. As a result, the sentencing court erred by exercising its discretion based on an error of fact. See *State v. Ward*, 292 Kan. 541, Syl. ¶ 3, 256 P.3d 801 (2011) *cert. denied* 132 S. Ct. 1594 (2012).

*Lack of Criminal History*

It is uncontroverted that Theurer's criminal history showed no prior convictions or juvenile adjudications. As a result, for sentencing purposes, Theurer was assigned a criminal history score of I, the least serious classification under the RKSGA. See K.S.A. 2013 Supp. 21-6809. But the sentencing judge found that Theurer's lack of a criminal record also should be considered a mitigating factor in the totality of circumstances justifying departure:

28

"[Theurer] has no prior criminal history. There is not only a lack of felony convictions, but there is, in fact, no prior misdemeanor convictions, and *there is no evidence that he has ever broken the law before*. The State in their response correctly argues that since Mr. Theurer's Criminal History Score is an I that his past history has clearly and fairly been taken into account on the criminal sentencing grid. That is correct. But not all history scores I's are the same. There's absolutely nothing on Mr. Theurer's record. And a defendant's complete lack of criminal contacts can be considered in departing. It's not a factor by—in and of itself to justify departure, but it can be considered in the overall picture." (Emphasis added.)

On appeal, the State reprises its argument before the sentencing court, contending Theurer's "lack of criminal history was already factored in by the sentencing grid" and it is, therefore, inappropriate for consideration as a departure factor. Echoing the sentencing court, Theurer contends substantial competent evidence showed more than just a nonexistent record of convictions or adjudications. According to Theurer, the evidence showed "a complete lack of evidence of *any* criminal behavior." (Emphasis added.)

It is well-settled law that "a defendant's criminal history cannot be used as justification for a departure sentence when the sentencing guidelines have already taken the defendant's criminal history into account in determining the presumptive sentence within the grid." *State v. Richardson*, 20 Kan. App. 2d 932, 941, 901 P.2d 1 (1995). In this case, Theurer received favorable consideration under the sentencing guidelines for his lack of prior convictions or juvenile adjudications.

The sentencing court, however, may consider facets of the defendant's criminal history that the guidelines do not factor into the calculation of the defendant's criminal history score. 20 Kan. App. 2d at 941. For example, in *Richardson*, the sentencing court found that, depending on the facts of the case, the lengthy period of time that elapses since a defendant's last felony conviction may provide a substantial and compelling

29

reason for a departure because such a factor ventures "beyond the type and number of offenses" in the defendant's criminal history. 20 Kan. App. 2d at 941.

The evidence before the sentencing court in this case, however, did not show a "complete lack of evidence of *any* criminal behavior." (Emphasis added.) Substantial and compelling evidence was to the contrary. According to the Pawnee Mental Health Services drug and alcohol evaluation, Theurer admitted that he started drinking alcohol at the age of 17. This was a violation of Kansas law. See K.S.A. 2013 Supp. 41-727 ("[N]o person under 21 years of age shall possess, consume, obtain, purchase or attempt to obtain or purchase alcoholic liquor or cereal malt beverage except as authorized by law."). Theurer reported that he stopped drinking at the age of 24. Thus, by his own admission, Theurer was illegally drinking alcoholic or cereal malt beverages 4 years prior to reaching the legal drinking age in Kansas.

We do not find substantial competent evidence to support the sentencing court's finding that "there is no evidence [Theurer] has ever broken the law before" or that his criminal history was "beyond the type and number of offenses" already incorporated into his criminal history score. See *Richardson*, 20 Kan. App. 2d at 941. As a result, this reason should not have been considered a mitigating factor by the sentencing court. The sentencing court erred by exercising its discretion based on an error of fact. See *Ward*, 292 Kan. 541, Syl. ¶ 3.

*Threat to Public Safety*

At the sentencing hearing, the judge stated, "I think the Court can find that Mr. Theurer is not a threat to public safety, that he accepts his responsibility, and that it's doubtful he would present a threat to public safety in the future based on the LSI-R and the Pawnee report." On appeal, citing much of the evidence presented at the sentencing

hearing, Theurer argues this evidence "demonstrated substantial . . . support for the [sentencing] court's finding that this defendant is no threat to society."

At the outset, a defendant's lack of danger to the public may constitute a valid mitigating factor in a sentencing court's decision to impose departure sentences. See *State v. Bird*, 298 Kan. 393, 400, 312 P.3d 1265 (2013); *State v. Murphy*, 270 Kan. 804, 807-09. 19 P.3d 80 (2001), *overruled on other grounds by State v. Martin*, 285 Kan. 735, 175 P.3d 832 (2008).

Theurer supports his argument, in part, by quoting from character reference letters, which in numerous instances extolled his "propensity for public speaking," his potential benefit to society, his academic abilities, his supportive family, and personal qualities. Theurer cites another letter which "explained that only one or two students per year at most have undertaken to obtain both the veterinary degree and the Ph.D. degree simultaneously, which path Mr. Theurer has pursued in order to be an effective leader in beef cattle veterinary medicine." In sum, Theurer argues these letters demonstrate his "ability to do great things for humanity."

We are persuaded this evidence did not sufficiently support the specific factor at issue. Young and Stanley were not killed because Theurer is well-educated and a captivating speaker, shows promise in veterinary medicine, or has family support. Young and Stanley were killed because, despite all of these noteworthy qualities and Theurer's "ability to do great things for humanity," Theurer drove recklessly at a high speed going the wrong way on a highway while extremely intoxicated. That is the particular threat to public safety at issue here.

Most relevant and probative of the factor of whether Theurer is a threat to public safety are the nature of the crimes of conviction and evidence relating to Theurer's

excessive use of alcohol which played a critical role in the involuntary manslaughter deaths of Young and Stanley.

Prior to sentencing, Theurer was referred by his defense counsel to the Pawnee Mental Health Service for an alcohol and drug evaluation. Robert Wisdom conducted a 90-minute evaluation of Theurer. The results of his evaluation were reported in a three-page document provided to the sentencing court.

In particular, the report stated that following the collision Theurer completed a "32 hour on line 'alcohol class' suggested by his attorney." Under the category "Alcohol/Drug History" was stated:

> "[Theurer r]eports he [first] consumed alcohol at age 17 and most recently drank at the end of January, 2013. Reports his usual drinking pattern prior to his stopping consisted of having *4-6 beers or drinks on a weekend night with friends 2-3 times a month. Admits he has had alcohol related memory blackouts on a couple of occasions*, but denies any history of withdrawal. He denies any history of illegal drug use." (Emphasis added.)

As part of the evaluation, Theurer was asked to complete the Substance Abuse Subtle Screening Inventory (SASSI). This test is described as "an objective measure designed to differentiate substance abusers from non-abusers." The SASSI profile indicated a "'low probability'" that Theurer had a substance dependence disorder.

Theurer also completed the Michigan Alcoholism Screening Test (MAST), which is described as "a 22-item questionnaire designed to provide a rapid and effective screening for lifetime alcohol-related problems and alcoholism." Theurer scored a 3. According to the MAST, "Scores between 3-5 suggest early or middle problem alcohol use." With regard to this test result, Wisdom remarked: "Testing suggests possible early problem drinker, but this score is influenced by his legal situation." No explanation for Wisdom's comment was provided to the sentencing court.

Wisdom gave an Axis I primary diagnosis of "alcohol abuse, early full remission" and a secondary diagnostic impression of "Adj disord mixed anxiety, depress" which we assume to be an adjustment disorder with mixed anxiety and depression.

Wisdom recommended Theurer receive outpatient counseling to help him "establish a sober lifestyle and discuss options for sober socializing" and that Theurer "abstain from alcohol or any illegal drug use." The evaluator provided the following prognosis: "Considering that Mr. Theurer denies that he has consumed alcohol for several months and feels remorse for the DUI fatalities, the prognosis is generally good that [Theurer] will not be driving after drinking in the foreseeable future." Of note, Wisdom did not mention what importance, if any, the test results had in the formulation of his prognostication.

Was there substantial competent evidence that Theurer is not a threat to public safety? The answer to that question begins with the events of May 13-14, 2012. Theurer was convicted of two counts of involuntary manslaughter. It is an understatement to observe that, by statutory definition, the crime of involuntary manslaughter is violent, given that it results in the loss of human life. This factual context sharply contrasts with cases like *Bird*, where the "nonviolent nature" of the crime of conviction (cocaine possession) supported a finding that the defendant posed no threat to society. *Bird*, 298 Kan. at 400.

Next, it is apparent that Theurer's potential to threaten public safety is inextricably linked to his excessive consumption of alcohol. Although, to date, Theurer has only admitted to drinking two beers during the several hours he was at the Mustang Gentlemen's Club, within 2 hours after the collision he had a blood-alcohol level of .19. This test result is *more than twice* the legal limit for alcohol consumption while driving. See K.S.A. 2011 Supp. 8-1567(a)(2). Obviously, this was a very high level of intoxication.

33

While Theurer has portrayed that evening as an uncharacteristic, single lapse of judgment, the evidence shows that Theurer has a notable history of underage drinking prior to reaching age 21. Similar to the evening of the collision, Theurer admitted he would occasionally drink excessively, four to six beers or mixed drinks in an evening. While periodic, this was not inconsequential drinking of alcoholic beverages. Of special concern, and further corroboration of Theurer's custom to excessively drink alcohol off and on, was evidence that Theurer experienced "alcohol related memory blackouts on a couple of occasions" prior to the collision. Moreover, according to Theurer, he only stopped drinking in January 2013. Given that Young and Stanley were killed on May 14, 2012, as a result of Theurer's highly intoxicated condition, the evidence was uncontroverted that more than 6 months after the victims' deaths, Theurer had continued his practice of drinking alcoholic beverages.

In light of this evidence, including the deadly nature of the crimes Theurer committed, we find the two conflicting alcohol evaluation results do not provide substantial competent evidence that Theurer is not a danger to public safety. While the SASSI profile indicated a "low probability" that Theurer had a substance dependence disorder, the MAST test, designed to screen for lifetime alcohol abuse and alcoholism, indicated that Theurer exhibited "early or middle problem alcohol use." These inconsistent test results, given the uncontroverted history of Theurer's episodic excessive alcohol consumption, provide scant support for the proposition that Theurer does not pose a risk to public safety based on the serious consequences of driving while intoxicated.

There was clearly some threat to public safety, which the sentencing judge tacitly acknowledged in his concluding words to Theurer:

"I hope that you can completely abstain from the use of alcohol. I hope that you never touch a drop of alcohol again. I hope that you can lead a life that's alcohol free and set the

34

example for everybody else out there, that you don't need alcohol. And if you do this, then that is what I hope. And if you don't, then you'll make a fool out of the whole system."

We conclude the record, considered as a whole, does not provide substantial competent evidence to support the sentencing court's factual finding that Theurer was not a threat to public safety. As a result, this reason should not have been considered a mitigating factor. The sentencing court erred by basing its discretion on an error of fact. See *Ward*, 292 Kan. 541, Syl. ¶ 3.

*Acceptance of Responsibility*

The sentencing court found that Theurer "expressed remorse" as proof that he had accepted responsibility for his criminal conduct. On appeal, Theurer argues "[t]here is substantial competent evidence of record to show that the defendant accepted responsibility for his crimes, including his statement to the court at sentencing and his no contest plea[s]."

A defendant's acceptance of responsibility may be a mitigating factor in support of a departure sentence. *Bird*, 298 Kan. at 398-99.

We question whether Theurer's no contest pleas are proof of his acceptance of responsibility. These pleas were "a formal declaration that the defendant does not contest the charge." K.S.A. 22-3209(2). Thus, a no contest plea "is a plea where the defendant *does not expressly admit his or her guilt to the charge*." (Emphasis added.) *State v. Case*, 289 Kan. 457, Syl. ¶ 3, 213 P.3d 429 (2009). Indeed, by pleading no contest Theurer conspicuously avoided admitting his legal responsibility for the deaths of Young and Stanley. Moreover, Theurer obtained a very favorable outcome because of his no contest pleas, which included pleading to only two of the charged crimes, obtaining in return dismissal of the aggravated battery charges for the serious injuries he caused his

35

passengers, immunity from prosecution for any other charges, and a recommendation of concurrent sentences.

Theurer also points to his personal statement at sentencing. We only have the written record of sentencing, and appellate courts generally do not pass on credibility issues. See *State v. Jones*, 295 Kan. 1050, 1057-58, 288 P.3d 140 (2012). However, because Theurer has directed us to his statement, we will consider his words.

Theurer stated remorse for his actions and their consequences, but he did not dwell on expressions of personal fault for causing the deaths of Stanley and Young. He was sorry for "the actions that led to the tragic accident," regretted "what occurred during those early morning hours," and hoped to have "the opportunity to . . . explain the nightmare that I have been through" and its consequences. When Theurer did admit fault, it was for a "tragic, dumb mistake," or a "lapse of judgment," Theurer's statements to the sentencing court are also noteworthy because they mirrored his three-sentence response in the PSI questionnaire when he was asked to provide his version of the crimes. Theurer wrote: "I made a mistake. I consumed alcohol and drove my vehicle. I am truly sorry for all the consequences."

Theurer's oral and written statements accepting responsibility are remarkable for their brevity and minimization. His nondescript statements also did not include any recantation or clarification of his exculpatory statement to Officer Sanders that during almost 7 hours between the time he arrived at the Mustang Gentlemen's Club and the collision that killed Young and Stanley, he only drank two beers. Moreover, our review of the record on appeal reveals that Theurer has not admitted that he drank to excess, was intoxicated, or drove recklessly at the time he caused the collision which killed Young and Stanley.

Suffice it to say, we discern a marked difference between this record and the record in *Bird*, where our Supreme Court found substantial competent evidence that a defendant had accepted responsibility:

"Contrary to the State's argument, the record includes evidence of acceptance of responsibility with respect to the controlling drug crime on which the district court departed. Specifically, the record shows that Bird pled guilty to the controlling crime of cocaine possession, saving the State and its witnesses significant trial preparation, time, and expense. Further, at the sentencing hearing, when questioned under oath by defense counsel, Bird acknowledged that the baggie containing cocaine residue that led to his possession conviction was found in his home and that he had prior drug convictions and problems, and he went so far as to say that he was 'surely more than guilty.' Bird was directly asked by defense counsel, 'You don't deny your responsibility?' He replied, 'No doubt.'" 298 Kan. at 399-400.

Unlike the defendant in *Bird*, Theurer did not formally admit his guilt to the underlying facts in court. His expressions of remorse, given the overwhelming evidence of his guilt and the harm which resulted from the deaths of Young and Stanley seem muted by comparison. Still, the sentencing judge was in the best position to evaluate Theurer's credibility and he found, "I think there is no doubt in anybody's mind that Mr. Theurer is remorseful."

We conclude there was substantial and competent evidence to support the sentencing court's finding that Theurer accepted responsibility for his criminal conduct. Whether this individual factor, together with the other factors relied on by the sentencing court, provided sufficient grounds to impose durational departure sentences rather than imprisonment is considered later.

*Amenability to Rehabilitation*

In the district court, Theurer asserted he was highly amenable to rehabilitation because he had demonstrated "an increased understanding and awareness of the nature and consequences of his actions," as shown by his completion of a 32-hour on-line drug and alcohol awareness course and a 90-minute alcohol and drug evaluation. Theurer further explained that as part of his rehabilitation efforts, he had attempted, "on numerous occasions," to inform others "about the terrible mistake he made the night of the accident."

The sentencing court found that Theurer's rehabilitation efforts were, under the totality of the circumstances, a substantial and compelling reason to impose departure sentences. The sentencing court explained:

> "Defendant's rehabilitative efforts: It was mentioned that Mr. Theurer has—it's been a year since this accident occurred, and he's not been in trouble. He's gone to school, worked on his degree, and preparing for this day, and has presented to the Court through his attorney a proposal that during—instead of being sitting in prison for the next three years—approximately three years—that he go out into society to high schools, to colleges, universities, to whoever, and tell them his story, to educate them, and . . . put a face with the person.
> ". . . Mr. Theurer would be, and it's been proposed, an excellent person to speak. People have described him in the letters as an 'impactful speaker' with the 'ability to capture an audience.' He's 'well-spoken.' He will 'be an advocate against drunk driving' if allowed to speak. 'When he speaks, people listen.'"

A defendant's amenability to rehabilitation, while not a substantial and compelling reason to depart from the presumptive guidelines sentence by itself, may be considered in the overall picture; in other words, a sentencing court may properly consider such evidence in the totality of circumstances if other factors warrant a departure. *State v. Ussery*, 34 Kan. App. 2d 250, 263, 116 P.3d 735, *rev. denied* 280 Kan. 991 (2005); see

38

also *Murphy*, 270 Kan. at 806-09, (upholding departure where defendant had been accepted in Labette Correctional Conservation Camp, noted as having reputation for "positive results").

Nevertheless, while rehabilitation efforts can serve as a potential factor for departure, these efforts should be geared towards addressing the defendant's behavior that caused the crime for which the defendant was convicted. See *State v. Chrisco*, 26 Kan. App. 2d 816, 824, 995 P.2d 401 (1999); *State v. Alaga*, No. 91,360, 2004 WL 2796407, at *2-3 (Kan. App. 2004) (unpublished opinion).

While Theurer did complete a 32-hour on-line alcohol and drug class suggested by his attorney and an alcohol and drug evaluation, the sentencing court's rehabilitation findings were primarily focused on Theurer's potential, due to his speaking ability, to persuade *others* to avoid the criminal conduct that led to his convictions. It is unclear and unstated how Theurer's potential to speak to others about the dangers of driving while intoxicated exemplifies his amenability to personal rehabilitation.

With this caveat, however, we are persuaded there was some evidence to support that Theurer undertook two basic rehabilitative efforts prior to sentencing. We will consider the significance of this individual factor, together with the other factors relied on by the sentencing court later.

*Good Grades, Good Character, Character Reference Letters, and Supportive Family*

On appeal, Theurer mentions but does not specifically defend the sentencing court's findings on the remaining reasons for departure, which include good grades, good character, character reference letters, and a supportive family. On the other hand, the State argues "these factors have absolutely nothing to do with the facts and circumstances within the case."

With regard to Theurer's good grades, the transcripts show Theurer maintained a 4.0 GPA through high school and that he achieved excellent grades during his first 4 years at KSU. In the 2011-2012 academic year, however, Theurer earned seven C's, the first such grades shown. Theurer earned a 2.3 GPA in the fall semester of 2011 and a 2.7 GPA in the spring semester of 2012, both before his commission of the crimes, and a 2.5 GPA in the fall semester of 2012, after the crimes were committed. Nothing in the record explains the unusual and significant decline in Theurer's grades in the months leading up to the fatal events of May 14, 2012. Considered over several years, however, there was evidence that Theurer had a history of achieving good grades.

Regarding Theurer's good character, the evidence primarily consisted of character reference letters. The State responds: "The Defendant's opportunity filled and affluent life within a well-connected family is evident in the Defendant's 100 plus letters of recommendation. . . . The State contends that a defendant with less opportunities, financial support, and socioeconomic status would not have had access to the letters of recommendation."

We will not second-guess the sentencing court's evaluation of Theurer's character based on the letters submitted to the sentencing court. The sentencing court characterized the letters as "good," and there is evidence supporting that factual finding.

The sentencing court also found that Theurer has a supportive family, and the State does not dispute that fact. We conclude the sentencing court's finding on this factor was supported by substantial evidence. Our Supreme Court has indicated, however, that family support may only qualify as a substantial and compelling factor when combined with other mitigating factors favoring a departure. See *State v. Spencer*, 291 Kan. 796, 814-16, 248 P.3d 256 (2011).

40

WHETHER THERE WERE SUBSTANTIAL AND COMPELLING REASONS TO IMPOSE
DEPARTURE SENTENCES IN THIS INVOLUNTARY MANSALAUGHTER CASE

The sentencing court found that none of the individual reasons or factors it relied on was sufficient, by itself, to warrant the imposition of departure sentences. The sentencing court concluded that the totality of the reasons, however, showed that Theurer was an exceptional person deserving of dispositional departure sentences. As a result, we next consider whether—setting aside those factors which were invalid or for which there was no substantial competent evidence—the sentencing court's "reasons collectively constitute a substantial and compelling basis for departure." *State v. Bird*, 298 Kan. 393, 398, 312 P.3d 1265 (2013). In other words:  Does Theurer's acceptance of responsibility, amenability to rehabilitation, good grades, good character, character reference letters, and supportive family collectively constitute a substantial and compelling basis for imposing dispositional departure sentences in this involuntary manslaughter case?

We begin our analysis mindful of our Supreme Court's longtime admonition: "'"Reasons which may in one case justify departure may not in all cases justify a departure.' [Citation omitted.] Rather, we must evaluate the offense of conviction, the defendant's criminal history, and the departure reason stated, as well as the purposes and principles of the Kansas Sentencing Guidelines."' [Citations omitted]." *State v. Martin*, 285 Kan. 735, 744, 175 P.3d 832 (2008). We will evaluate the propriety of the sentencing court's dispositional departure decision in this case in accordance with our Supreme Court's four-part guideline.

First, the offenses of conviction were two counts of involuntary manslaughter while driving under the influence of alcohol, a severity level 4 person felony, in violation of K.S.A. 2013 Supp. 21-5405(a)(3); see K.S.A. 2013 Supp. 8-1567(a)(2). As mentioned earlier, these are not only crimes of violence, but the violence resulted in the senseless deaths of two innocent victims, Young and Stanley. The killing of these two individuals

41

in the prime of their lives is undeniably a grievous harm. The significance of this harm is only heightened in this case, however, when considering that Young and Stanley were each parents to two young children. The handwritten letters and testimony of Young's and Stanley's family members eloquently expressed the unquestionable misery and loss they experienced as a direct result of Theurer's criminal conduct.

The sentencing court was obligated to give appropriate consideration to the evidence presented by the families of Young and Stanley in this sentencing departure matter. Our Supreme Court has noted that Article 15, § 15 of the Kansas Constitution provides that crime victims have a right "'to be heard at sentencing.'" *State v. Hines*, 296 Kan. 608, 616, 294 P.3d 270 (2013). With particular regard to sentencing departure hearings:

> "K.S.A. 21-4718(a)(1) [now K.S.A. 2013 Supp. 21-6817(a)(1)] provides that '[t]he victim of a crime or the victim's family shall be notified of the right to be present at the hearing.' This statute further requires that '[t]he court shall review the victim impact statement.' Finally, K.S.A. 21-4716(d) [now K.S.A. 2013 Supp. 21-6815(d)] states:
>
>> "'In determining aggravated or mitigating circumstances, *the court shall consider*:
>> (1) Any evidence received during the proceeding;
>> (2) the presentence report;
>> . . . .
>> (4) any other evidence relevant to such aggravating or mitigating circumstances that the court finds trustworthy and reliable.'" (Emphasis added.) 296 Kan. at 617.

The Kansas Constitution, implementing statutes, and our Supreme Court's caselaw provide victims and their families the right in sentencing matters to inform the sentencing court of the harmful impact caused by the defendant's criminal conduct. Moreover, with specific regard to a sentencing court's departure decision, the court shall consider this

evidence in exercising its judicial discretion. See K.S.A. 2013 Supp. 21-6815(d); K.S.A. 2013 Supp. 21-6817(a)(1)-(4).

In the present case, the sentencing court personally heard from the victims' family members and reviewed their written victim impact statements. *Without exception*, all of the statements from the victims' families emphasized the need for Theurer to serve a prison sentence as punishment for his crimes. Especially given the undeniable, life-altering consequences of Theurer's criminal conduct, we believe the unanimous request by the family members of Young and Stanley that Theurer receive presumptive sentences of imprisonment deserved careful consideration in the sentencing court's decision whether to grant departure sentences.

Continuing with our evaluation of the crimes of conviction, while these crimes were, by their nature, violent and deadly, a defendant's culpability may vary widely depending on the facts of the specific case. Here, Theurer's culpability was especially egregious. Theurer spent about 6 hours at the Mustang Gentlemen's Club during which time he claimed that he only drank two beers. Theurer told police he stopped drinking about 30 minutes prior to leaving Junction City to drive to Manhattan, about a 20 mile trip. Yet, at about 4:30 a.m.—1 hour and 45 minutes *after* the collision which occurred at about 2:45 a.m.—Theurer's blood-alcohol level was more than two times the legal limit permitted under Kansas law. Theurer's truck also contained cans of beer and a bottle of bourbon in the passenger compartment. In short, there was overwhelming evidence that Theurer was very intoxicated as he traveled a considerable distance on Kansas roadways shortly before the fatal collision.

It is also uncontroverted that Theurer's intoxication significantly impaired his ability to safely drive a motor vehicle. Eyewitnesses reported Theurer's vehicle was swerving, traveling erratically, and speeding excessively in a construction zone shortly before the collision. One motorist's repeated efforts to alert Theurer that he was driving

on the wrong side of the road by flashing his vehicle's headlights, honking his horn, and waving his arms were totally ignored. Additionally, there was no evidence indicating that Theurer attempted to avoid the head-on collision. In short, the evidence of reckless driving while under the influence of alcohol was overwhelming and uncontroverted.

As part of our evaluation of these two involuntary manslaughter offenses, this case is also unique given that our Supreme Court has, on numerous occasions over the years, recognized the Kansas Legislature's efforts to punish intoxicated drivers and the harms resulting from them. *Miller v. Johnson*, 295 Kan. 636, 729, 289 P.3d 1098 (2012) (Johnson, J., concurring in part and dissenting in part) (The legislature "passed tougher driving under the influence laws to try to get the drunks off of Kansas roads."); *Bland v. Scott*, 279 Kan. 962, 974, 112 P.3d 941 (2005) ("We are very aware that deaths and injuries on our highways caused by intoxicated drivers are a major problem for Kansas and the nation. In recent years, the legislature has increased the penalties for convictions of driving under the influence in the effort to reduce the carnage."); *Thornton v. Shore*, 233 Kan. 737, 753, 666 P.2d 655 (1983) ("Clearly it is strong public policy to remove drunk drivers from Kansas roads."); *State v. Compton*, 233 Kan. 690, 699, 664 P.2d 1370 (1983) ("The objective sought to be attained by the legislature is to deter drunken driving and thus reduce the injuries, death and property damage attributable to it by making the penalties for DUI certain and severe."). Our Supreme Court has repeatedly acknowledged the Kansas Legislature's long-standing imperative to punish intoxicated drivers in an effort to deter deaths, such as the two which occurred in this case.

In summary, consonant with *Martin*, we have evaluated the involuntary manslaughter offenses committed by Theurer in this case. We conclude these offenses were, by statutory definition, violent and deadly felony crimes. Given Theurer's obvious intoxication, his reckless driving, and the killing of two innocent victims, his criminal conduct was especially aggravated. These offenses irreparably harmed the victims' families who, as a result, opposed any departure from presumptive imprisonment.

Finally, the Kansas Legislature has repeatedly and consistently focused its attention on punishing intoxicated drivers due to the dangers they pose on Kansas highways. The particular facts of this involuntary manslaughter case weigh heavily against departing from the presumptive sentences of imprisonment.

Next, in keeping with *Martin*, we consider Theurer's criminal history. As discussed earlier, Theurer's criminal history, which was factored into the RKSGA scoring, resulted in the presumptive guidelines sentences of imprisonment. While it is undisputed that Theurer did not have any prior convictions or adjudications, it is also apparent (and especially relevant to the crimes of conviction) that prior to committing two counts of involuntary manslaughter, Theurer violated Kansas liquor laws by drinking alcoholic beverages from age 17 until age 21. It is unknown whether Theurer's history of episodic excessive drinking which occasionally resulted in blackouts occurred during this period or later. Regardless, Theurer's lack of a formal criminal record prior to the commission of these crimes is unremarkable given his 4 years of illegally consuming alcoholic beverages while he was under age 21. Considering the cause of this double fatality collision, we are persuaded that Theurer's history of underage drinking significantly lessens the weight to be given his lack of a formal criminal record as one basis for justifying his departure sentences.

Next, we address the third component of the *Martin* guidelines by collectively reviewing the mitigating factors relied on by the sentencing court to justify imposition of the departure sentences. For reasons detailed earlier, while there was some evidence of Theurer's acceptance of responsibility, there was also evidence to the contrary. In particular, Theurer's pleas of no contest, his repeated characterization of his crimes as a "mistake" or "lapse of judgment," and his failure to admit to being intoxicated or even to driving recklessly at the time of the collision temper the weight that might otherwise have been accorded this mitigating factor.

45

Similarly, with regard to Theurer's amenability to rehabilitation, more than 1 year passed after the commission of the crimes until Theurer's sentencing hearing. During that time, Theurer submitted to a court-ordered 90-minute substance abuse evaluation and viewed an informational Internet course on alcohol abuse. He also claimed he stopped drinking alcohol, but that was not until 6 months after the collision. Given Theurer's underage drinking of alcoholic beverages, his tendency to drink very excessively episodically, his occasional blackouts due to drinking, and his obvious intoxication at the time of the crimes, these rehabilitative efforts do not seem overly ambitious. For all of these reasons, we are persuaded this factor did not provide a compelling basis for departure in this case.

We understand that Theurer, like many criminal defendants, has a supportive family. His academic record, at least until the year before the commission of these crimes, was excellent. And, unlike many criminal defendants, based on the numerous character reference letters, he also has many friends and acquaintances in the community who are impressed with his academic achievements, speaking ability, and especially his potential to contribute to society in the field of agriculture. The sentencing judge relied on some of these factors in finding that Theurer is "an exceptional person that I find to be an atypical case." We recognize that good character, family, and community support ordinarily carry some weight as mitigating factors.

Nevertheless, we are convinced these valid mitigating factors for which there was substantial competent evidence, taken together, did not warrant departure sentences in this case. In particular, we believe the sentencing court overlooked important evidence which called into question the significance of the factors related to Theurer's acceptance of responsibility and amenability to rehabilitation in the context of this case. With regard to good character, family, and community support, these factors pale in significance given the aggravated nature of these crimes and the harms which resulted to Young, Stanley, and their families. In summary, in a more typical case involving less serious

46

crimes, less culpability, and less deadly consequences, the totality of these mitigating factors might have supported departure sentences. But that is not the case before us.

Departure reasons must be substantial and compelling. As our Supreme Court has instructed:

> "In order for a mitigating factor to be substantial, the reason must be real, not imagined, and of substance, not ephemeral. In order to be compelling, the mitigating factor must be one *which forces the court, by the facts of the case, to abandon the status quo and to venture beyond the sentence that it would ordinarily impose*." (Emphasis added.) *Hines*, 296 Kan. 608, Syl. ¶ 5.

Taken together, the valid mitigating factors were not particularly substantial, and they were not compelling because they did not force the sentencing court "by the facts of the case," see 296 Kan. 608, Syl. ¶ 5, to forsake the presumptive sentences of imprisonment established by the RKSGA.

Finally, in evaluating the sentencing court's departure decision, we must consider whether the purposes and principles of the RKSGA justify departure in this case. See *Martin*, 285 Kan. at 744. As discussed earlier, the sentencing court did not apply these purposes and principles but incorrectly cited and applied K.S.A. 2013 Supp. 21-6601. This mistaken application of law resulted in the sentencing court's undue emphasis on its view of Theurer as an exceptional person rather than considering the mitigating factors in context with the deplorable facts and circumstances of this case. One of the underlying principles of the sentencing guidelines identified by our Supreme Court is that "sanctions should be imposed based on harm inflicted." *Bird*, 298 Kan. at 399. For all of the reasons discussed, the departure sentences granted by the sentencing court were not based on the harm inflicted upon Young, Stanley, and their families.

47

In conclusion, we hold the sentencing court erred by applying an incorrect legal standard in sentencing, by relying on departure reasons which were not substantial and compelling, and by making findings of mitigating factors not supported by substantial competent evidence. Finally, given the nature of the crimes committed, Theurer's aggravated culpability in the deaths of two innocent people, and the resulting harm to Young, Stanley, and their families, we conclude the sentencing court's valid departure factors, considered collectively, did not force the sentencing court to abandon the status quo of presumptive imprisonment in order to justify granting Theurer dispositional departure sentences of probation. See *Hines*, 296 Kan. 608.

The judgment of the sentencing court is reversed. The sentences are vacated, and the case is remanded to the district court for resentencing.