No. 120,017

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellant*,

v.

RONALD D. MORLEY,
*Appellee*.

SYLLABUS BY THE COURT

1.

A sentencing court is required to impose the presumptive sentence provided by the Kansas Sentencing Guidelines Act, K.S.A. 2018 Supp. 21-6815(a), unless the court finds substantial and compelling reasons to impose a departure sentence.

2.

A substantial and compelling reason to depart downward from a presumptive sentence is a mitigating factor. Although K.S.A. 2018 Supp. 21-6815(c)(1)(A)-(E) provides a list of potential mitigating factors, the list is nonexclusive, and a sentencing court may rely on nonstatutory factors to depart if they are consistent with the principles underlying the Kansas Sentencing Guidelines Act.

3.

A defendant's acceptance of responsibility may be a valid nonstatutory mitigating factor in support of a departure sentence.

1

4.

If a sentencing court determines that a departure sentence is warranted, it must state on the record at the time of sentencing the substantial and compelling reasons for the departure and make findings of fact regarding those mitigating factors. K.S.A. 2018 Supp. 21-6815(a); K.S.A. 2018 Supp. 21-6817(a)(4).

5.

An appellate court's standard of review for departure decisions depends on the issue presented. When we consider whether the record supports an articulated mitigating factor for a departure sentence, we review for substantial competent evidence. Substantial competent evidence is evidence possessing both relevance and substance that a reasonable person could accept as being adequate to support a conclusion.

6.

When the record supports a valid, articulated mitigating factor, an appellate court applies an abuse of discretion standard to determine whether the mitigating factor constituted a substantial and compelling reason to depart in the particular case.

7.

Whether the factors relied upon by the sentencing court constitute substantial and compelling reasons for departure from the sentencing guidelines is a question of law with no deference given to the sentencing court. The term "substantial" refers to something that is real, not imagined; something with substance and not ephemeral. The term "compelling" implies that the court is forced, by the facts of a case, to leave the status quo or go beyond what is ordinary. The question is whether the departure factors, as a whole, are substantial and compelling reasons for imposing a departure sentence in light of the offense of conviction, the defendant's criminal history, and the purposes of the sentencing guidelines. The analysis of this question is twofold:  first, whether a particular reason

2

given by the sentencing court is a valid departure factor and, second, whether the reasons, as a whole, are substantial and compelling reasons for departure in a given case.

8.

Reasons which may in one case justify a departure, may not in all cases justify a departure. Rather, the inquiry must evaluate the crime and the departure factors as a whole to determine whether departure in a particular case is justified. It is a question of what weight to give each reason stated and what weight to give the reasons as a whole in light of the offense of conviction and the defendant's criminal history. The inquiry also considers the purposes and principles of the Kansas Sentencing Guidelines.

9.

If an appellate court concludes that the sentencing court's factual findings are not supported by evidence in the record or do not establish substantial and compelling reasons for a departure, the appellate court must remand the case to the sentencing court for resentencing. K.S.A. 2018 Supp. 21-6820(f).

10.

Under the facts of this case, we hold that while a defendant's acceptance of responsibility may be a valid nonstatutory mitigating factor in support of a downward durational departure sentence, in this case there was no substantial competent evidence to support the factor that the defendant accepted responsibility for his crimes. Moreover, assuming there was substantial competent evidence to support this mitigating factor, the district court erred in its legal conclusion that this factor was real, substantial, and compelling such that the district court was forced by the case facts to abandon the status quo, venture beyond presumptive prison sentences, and grant probation.

Appeal from Shawnee District Court; MARK S. BRAUN, judge. Opinion filed August 16, 2019. Reversed, sentences vacated, and case remanded with directions.

*Stacy Edwards*, assistant attorney general, and *Derek Schmidt*, attorney general, for appellant.

*James C. Heathman*, of Heathman Law Office PA, of Topeka, for appellee.

Before BUSER, P.J., PIERRON and BRUNS, JJ.

BUSER, J.:  This is an appeal by the State of Kansas of the district court's granting of dispositional departure sentences to Ronald D. Morley. Upon our review, we hold the district court erred in two respects. First, the district court's finding that Morley accepted responsibility for his actions was not supported by substantial competent evidence. Second, assuming there was substantial competent evidence in support of this departure factor, that basis did not constitute a substantial and compelling reason to depart under the totality of circumstances in this case. Accordingly, the judgment of the district court is reversed, the sentences are vacated, and the case is remanded to the district court for resentencing.

FACTUAL AND PROCEDURAL BACKGROUND

On November 3, 2016, Morley was indicted on 12 felony counts. In particular, he was charged with four counts of securities fraud in violation of K.S.A. 17-12a501; four counts of sale of an unregistered security in violation of K.S.A. 17-12a301; and four counts of acting as an unregistered issuer agent in violation of K.S.A. 17-12a402. According to the indictment, the crimes occurred from December 2011 through April 2013. The indictment further alleged that four Kansas investors lost a total of $845,900 as a consequence of Morley's criminal conduct.

Prior to trial, a plea agreement was reached between the State and Morley. The agreement provided that Morley would plead no contest to one count of securities fraud, a severity level 4 nonperson felony, and one count of acting as an unregistered issuer agent, a severity level 5 nonperson felony. The State agreed to dismiss the rest of the

4

charges in the original indictment. The State also agreed to recommend that the sentences run concurrent. For his part, Morley agreed that "he owes restitution to all victims listed in the amended indictment but does not agree to the amount." Under the agreement, the parties were permitted to argue the amount of restitution and all other aspects of the sentence.

Punishment for both convictions was presumptive prison, although the charge of acting as an unregistered issuer agent was a border box offense on the sentencing grid. Of note, Morley's convictions were also subject to a special rule which provides that any violation of the Kansas Uniform Securities Act (KUSA) shall be presumed imprisonment if the violation resulted in a loss of $25,000 or more. See K.S.A. 2018 Supp. 17-12a508(a)(5).

On March 23, 2018, Morley pled no contest to an amended indictment in accordance with the plea agreement. Subsequently, the State submitted a sentencing memorandum summarizing the factual basis for the pleas as stated at the plea hearing:

> "In brief, Mr. Morley sold preferred stock shares in Summit Trust Company to four Kansas investors: [B.A.], [T.A.-F.], [L.H.], and [D.R.]. Mr. Morley counseled the victims the preferred stock was a safe investment with a guaranteed 6% quarterly dividend, and he further advised the victims the preferred stock was a good fit for their stated investment goals and avowed low risk tolerances. The victims relied entirely on Mr. Morley's representations in making their preferred stock purchases, as Mr. Morley failed to provide any of the victims with a prospectus or offering memorandum. Contrary to Mr. Morley's representations, the preferred stock investment was high risk and low liquidity and was only open to accredited investors. Mr. Morley knew none of the Kansas investors qualified as accredited investors, and yet nonetheless sold the Kansas victims the preferred stock securities. In addition, Mr. Morley failed to notify the victims he had been permanently barred from the securities and investment advisory business in Maryland after a 2006 consent order issued by the Securities Commissioner of Maryland.

"Mr. Morley was not and never has been registered to sell securities in Kansas as an issuer agent. Mr. Morley earned between a 5.2% and 6% commission for the Kansas victims' purchase of preferred stock.

"[B.A.] invested a total of $352,500 in the Summit Trust preferred stock; [T.A.-F.] invested $252,400; [L.H.] is invested $150,000; and [D.R.] also invested $150,000. [T.A.-F.] redeemed $29,000 in preferred stock shares over time (leaving a remaining principal of $223,400), and [D.R.] redeemed $30,000 in preferred shares (leaving a remaining principal of $120,000).

". . . None of the Kansas investors have been able to recover any of their lost principal."

The State calculated a total loss to the four Kansas investors of $845,900. For his role in selling the stock to these investors, Morley received $50,154 in commissions. Morley acknowledged receiving about $3 million in commissions over a 10-year period from sales of Summit Trust Company (Summit) stock throughout the United States.

Before sentencing, Morley filed a motion for durational and dispositional departure sentences. In support of the motion, Morley asserted that a departure was appropriate "because of (1) his minor role in the offense; (2) similarly situated defendants have also received downward departures; [and] (3) his lack of criminal background, lack of danger to the public, his role in mitigating damage to his clients, providing restitution and his cooperation with the SEC and other investigators."

Sentencing occurred on July 3, 2018. During the hearing, Morley testified in support of the motion and three investors, B.A., D.R., and his wife, addressed the court and read victim statements. Four exhibits were admitted in evidence, including documents relating to the Summit stock offering and a 2006 consent order issued by the Maryland Securities Commissioner permanently barring Morley from the securities and investment advisory business in Maryland.

6

At the conclusion of the hearing, the district court sentenced Morley to 41 months' imprisonment upon his conviction for securities fraud and 32 months' imprisonment upon his conviction for acting as an unregistered issuer agent. The sentences were ordered to run concurrent. The district court granted Morley's motion for dispositional departure sentences based on the nonstatutory factor that Morley accepted responsibility for his crimes. The district judge reasoned:

> "[T]he ground that I'm relying on is to the extent that I believe it's—much of it is true is the taking of responsibility. I do think that whether it was entering the plea to . . . two counts, he did agree to pay restitution as ordered and to me, that's part of the focus of responsibility. The other part is he did plea. He plead[ed] no contest, but he certainly acknowledged and he understood he was going to be found guilty.
>
>     . . . .
>
>     ". . . It's the overall issue of accepting responsibility by entering a plea to the two offenses and agreeing to pay restitution is where I'm hanging my hat on."

Morley was placed on probation for 36 months and ordered to pay $845,900 in restitution.

After sentencing, Morley objected to the State's proposed journal entry which listed the sole basis for the district court's dispositional departure as "[d]efendant took responsibility for his actions." See Supreme Court Rule 170(d) (2019 Kan. S. Ct. R. 222). At the hearing held to resolve the language in the journal entry, the district judge approved the State's wording, stating, "That single ground was the one the Court relied on and still feels it was a substantial and compelling reason to depart. Court does note that it was the single ground of the defendant taking responsibility that moved me to grant the dispositional departure in this matter." The journal entry of judgment signed and filed by the district court stated:  "Reasons Cited as Basis for Departure:  Defendant took responsibility for his actions."

7

The State filed a notice of appeal contesting the district court's granting of the dispositional departure sentences.

KANSAS LAW REGARDING DEPARTURE DECISIONS AND STANDARDS OF REVIEW

The State presents two contentions on appeal. First, it asserts: "The district court's decision that the record supported an articulated reason for departure, namely Morley's acceptance of responsibility, is not supported by substantial competent evidence." Second, the State posits: "Even if the record supported the existence of the acceptance-of-responsibility departure factor, the district court abused its discretion in granting Morley's motion for departure." In response, Morley submits the district court's departure decision was supported by substantial competent evidence and "[t]he district court's reasons are valid for departure."

We begin with a summary of Kansas law applicable to departure decisions and our standards of appellate review. A sentencing court is required to impose the presumptive sentence provided by the Kansas Sentencing Guidelines Act (KSGA), K.S.A. 2018 Supp. 21-6815(a), unless the district court finds substantial and compelling reasons to impose a departure sentence. *State v. Theurer*, 50 Kan. App. 2d 1203, Syl. ¶ 1, 337 P.3d 725 (2014). A substantial and compelling reason to depart downward from a presumptive sentence is a mitigating factor. 50 Kan. App. 2d 1203, Syl. ¶ 2.

Although K.S.A. 2018 Supp. 21-6815(c)(1)(A)-(E) provides a list of potential mitigating factors, the list is nonexclusive, and a sentencing court may rely on nonstatutory factors to depart if they are consistent with the principles underlying the KSGA. 50 Kan. App. 2d 1203, Syl. ¶ 3. Of particular importance in this appeal, "[a] defendant's acceptance of responsibility may be a [nonstatutory] mitigating factor in support of a departure sentence." 50 Kan. App. 2d at 1232. This is because "[r]ecognizing a defendant's acceptance of responsibility as a nonstatutory departure factor is consistent

8

with the underlying principles of and legislative purposes behind enacting the [KSGA]." *State v. Bird*, 298 Kan. 393, Syl. ¶ 3, 312 P.3d 1265 (2013).

If, as in this case, a sentencing court determines that a departure sentence is warranted, it must state on the record at the time of sentencing the substantial and compelling reasons for the departure and make findings of fact regarding those mitigating factors. See K.S.A. 2018 Supp. 21-6815(a); K.S.A. 2018 Supp. 21-6817(a)(4); *State v. Reed*, 302 Kan. 227, Syl. ¶ 7, 352 P.3d 530 (2015).

On appeal—with reference to the first issue presented by the State—an appellate court's standard of review provides that we review for substantial competent evidence to ascertain if the record supports an articulated mitigating factor for a departure sentence. Substantial competent evidence is evidence possessing both relevance and substance that a reasonable person could accept as being adequate to support a conclusion. *State v. May*, 293 Kan. 858, 862, 269 P.3d 1260 (2012).

With reference to the second issue raised by the State, "[w]hen the record supports the articulated departure reasons and the articulated reasons are legally valid, we apply an abuse of discretion standard to determine whether a particular mitigating factor constituted a substantial and compelling reason to depart." *Bird*, 298 Kan. at 398.

A judicial action constitutes an abuse of discretion

> "if [the] judicial action (1) is arbitrary, fanciful, or unreasonable, *i.e.*, if no reasonable person would have taken the view adopted by the trial court; (2) is based on an error of law, *i.e.*, if the discretion is guided by an erroneous legal conclusion; or (3) is based on an error of fact, *i.e.*, if substantial competent evidence does not support a factual finding on which a prerequisite conclusion of law or the exercise of discretion is based." *State v. Ward*, 292 Kan. 541, Syl. ¶ 3, 256 P.3d 801 (2011), *cert. denied* 565 U.S. 1221 (2012).

9

Finally, if an appellate court concludes the sentencing court's "factual findings are not supported by evidence in the record or do not establish substantial and compelling reasons for a departure," the appellate court must "remand the case to the [sentencing] court for resentencing." K.S.A. 2018 Supp. 21-6820(f).

We will separately consider the State's two issues on appeal.

## WAS THERE SUBSTANTIAL COMPETENT EVIDENCE OF MORLEY'S ACCEPTANCE OF RESPONSIBILITY?

Although Morley argued that several factors justified a dispositional departure, the district court found only one mitigating factor for granting the dispositional departure sentences—Morley accepted responsibility for his crimes. In particular, the district court justified this finding of a nonstatutory mitigating factor by relying on evidence that Morley pled no contest to two felonies with the understanding that he was going to be found guilty and that he agreed to pay restitution as ordered by the court. Upon this factual basis, the district court found that Morley had accepted responsibility for his crimes.

We will individually analyze the evidence in support of Morley's no contest pleas and agreement to pay restitution.

*The No Contest Pleas*

The State's first claim of error is that Morley's no contest pleas were not substantial competent evidence to support that he accepted responsibility for his criminal wrongdoing. The State argues that Morley did not plead guilty and, therefore, he did not admit his guilt to the criminal charges. Instead, he pled no contest which calls his acceptance of responsibility into question. Moreover, the State points out that Morley's

10

stated reason for pleading no contest was because he received a favorable plea offer which resulted in dismissal of 10 KUSA felonies.

In response, Morley contends a no contest plea is similar to a guilty plea in that Morley acknowledged the State's incriminating evidence would result in convictions. Morley acknowledges that he was never licensed to sell securities in Kansas, that he failed to use due diligence to discover the fraudulent basis for the Summit securities, and he failed to disclose to the potential investors that this was a high risk investment.

As we did in *Theurer*, we question whether a defendant's no contest pleas are proof of acceptance of responsibility. A no contest plea is "a formal declaration that the defendant does not contest the charge." K.S.A. 22-3209(2). It is not an admission of wrongdoing. As we stated in *Theurer*, "a no contest plea 'is a plea where the defendant does not expressly admit his or her guilt to the charge.'" 50 Kan. App. 2d at 1232 (quoting *State v. Case*, 289 Kan. 457, Syl. ¶ 3, 213 P.3d 429 [2009]). By his entry of no contest pleas, Morley avoided admitting his legal responsibility for the securities violations perpetrated on the four investors. See *Theurer*, 50 Kan. App. 2d at 1232.

At the sentencing hearing, Morley made clear that he purposely wanted to plead no contest:

> "Q. . . .And you had the option to plead no contest or guilty; correct?
> "A. No contest or guilty, correct.
> "Q. And those were explained to you what those meant?
> "A. Yes.
> "Q. And you chose no contest?
> "A. Correct."

11

Moreover, Morley testified at the sentencing hearing that while he believed a jury could have found him guilty, he did not agree with the State's factual basis for the charges, as shown in this colloquy with defense counsel:

"Q. But you didn't agree with everything the State said as being factually true. You didn't admit it, did you?
"A. I don't remember doing that, no."

Morley acknowledged that he referred investors to Summit and facilitated their investing in the company but he repeatedly emphasized that it was Summit that defrauded the investors through a Ponzi scheme. Morley claimed that, like the four investors, he was "duped" by Summit. Although Morley testified that he had been involved in sales of Summit stock for many years, he claimed he did not know whether the stock was a high risk or a low risk investment. Morley admitted that he was not licensed to sell securities, but he stressed that he only acted as a consultant which Morley claimed did not require licensure because a consultant may not give financial advice.

While Morley admitted to mistakes or lapses in judgment in failing to thoroughly investigate the Summit stock offering, the State's evidence showed that—although Morley never disclosed this fact to the prospective Kansas investors—the stock prospectus or offering memorandum stated the investment was high risk and low liquidity and was only open to accredited investors—not the type of investors who Morley solicited on behalf of Summit in this case. Although Morley acknowledged the Kansas investors were misled, he minimized his own involvement in encouraging and facilitating the investors to purchase the stock. Moreover, Morley testified, "I knew nothing to be false that I told them."

Morley's minimization of his criminal wrongdoing was evident throughout his testimony:

"Q. And you indicated that your principle, and you believe you did this throughout, is to act forthright and honest; is that correct?

"A. Absolutely.

"Q. And you indicate that throughout this process, you were forthright and honest?

"A. I believe I was for—based on what I knew."

This disconnect between the State's factual basis establishing Morley's wrongdoing and his testimony underemphasizing his own criminal complicity was noticed by the district court:

"[T]here were a lot of issues or comments made during questioning and cross-examination about why the plea, why this, why that, and this was a no contest plea. That meant that Mr. Morley did not necessarily agree with the factual statement, and it was lengthy and detailed provided by the State, but that Mr. Morley does not necessarily agree with the factual statement presented, but that he agrees that if a jury heard that, or that the Court heard that in trial, that there was a sufficient factual basis to meet the elements of the offense."

In another colloquy with his counsel, Morley testified about his true purpose in pleading no contest:

"Q. Because you had 12 different counts, you decided it was better to make a plea bargain and not contest?

"A. That was the impetus and driving factor."

Indeed, similar to *Theurer*, one motivation for Morley to plead no contest was not to accept responsibility but to mitigate his accountability by obtaining a very favorable outcome to the criminal proceedings. See 50 Kan. App. 2d at 1232. In return for Morley's no contest pleas, the State agreed to dismiss with prejudice 10 other KUSA felonies, agreed to concurrent sentences, allowed Morley to argue for whatever restitution amount he believed was appropriate, and to seek dispositional and durational departure sentences.

13

Under the totality of these circumstances, we are not persuaded that the fact that Morley pled no contest was substantial competent evidence to prove the nonstatutory mitigating factor that Morley accepted responsibility for his crimes.

*Agreement to Pay Restitution*

At the sentencing hearing, Morley addressed the victims and offered this sworn assurance:

> "I will take my last dying breath making certain that you get every dime of your money back and my responsibility [for] that and the only way that I can do that is to stay in the insurance business and enable my experience to be applied to my obligations that I'm committing to."

During the sentencing hearing, the district court emphasized its difficulty in deciding whether to impose presumptive sentences of imprisonment or grant dispositional departure sentences to probation. Uppermost in the district judge's decision-making was the importance of providing the victims an opportunity for restitution: "But I wanted to give [Morley] not so much the chance, but the duty to work on that restitution and whether you [the victims] see it in your lifetime or if it goes to future generations based on estates, that that be dealt with."

The district court considered Morley's agreement to pay restitution, as ordered by the court, as evidence that he accepted responsibility for his crimes. But the State contends this was error because

> "the evidence did not support the district court's conclusion that Morley had shown willingness to pay restitution. . . . While [Morley] agreed he was responsible for paying some amount of restitution, he insisted he should only be liable for what he earned from the Summit . . . scheme and not the actual damages suffered by the victims."

14

In short, the State argues that Morley did not truly want to make the investors whole, but he only wanted to pay back the modest amount in commissions—$50,154—that he earned as a result of his wrongdoing, which resulted in the investors losing $845,900.

The State has a valid point. The payment of restitution to a crime victim is an important part of a defendant's sentencing. It is also not optional, unless the district court finds that the defendant does not have the means to pay it. In addition to a myriad of authorized dispositions, K.S.A. 2018 Supp. 21-6604(b)(1) provides that "the court *shall order* the defendant to pay restitution, which shall include, but not be limited to, damage or *loss caused by the defendant's crime*." (Emphasis added.) Moreover, the importance of restitution is shown by K.S.A. 2018 Supp. 21-6604(b)(2) which provides: "If the court orders restitution, the restitution shall be a judgment against the defendant which may be collected by the court by garnishment or other execution as on judgments in civil cases."

It is boilerplate Kansas law that "the appropriate measure of restitution to be ordered is the amount that reimburses the victim *for the actual loss suffered*." (Emphasis added.) *State v. Hand*, 297 Kan. 734, 738, 304 P.3d 1234 (2013). From the State's factual basis for the pleas, it is apparent the four Kansas investors had an actual loss of their principal investments totaling $845,900. Yet, while Morley agreed to pay restitution in whatever amount the district court ordered, beginning with the negotiated terms of the plea agreement and continuing throughout his appeal, Morley has contended that the amount of money he earned in commissions—not the actual loss to investors—is the appropriate amount of restitution.

We understand Morley's personal interest in limiting the adverse economic consequences of joint and several liability. But given Morley's argument for restitution in an amount wholly unrelated to the victims' actual loss (which constitutes only about 17% of the actual loss), we do not understand the district court's finding that Morley's

15

willingness to pay restitution—which is not optional but mandated by Kansas law—constitutes substantial competent evidence of his acceptance of responsibility in this case.

At the sentencing hearing, the State pointed out that during the lengthy criminal proceedings, Morley had not made any restitution payments to the victims. The district court discounted this argument which was certainly within its discretion. Of greater concern, however, is that Morley did not present any workable restitution plan to the district court. At the conclusion of the sentencing hearing, the district judge referenced Morley's "general" restitution plan and commented, "his apparent bankruptcy is about to be completed. He's talked generally about some income but apparently has access to money that he would be able to—and I say access. It may be a timing issue. It may be a continuing work issue as to where he goes to get that money or how that money comes in and how that plan would be done."

We readily acknowledge the difficult position these case facts presented to the district court. Although the district court was uncertain about Morley's ability to make restitution, it also noted, "[i]t certainly minimizes Mr. Morley's ability to do restitution or be able to work and do the things he needs to do if he's in prison." While true, our review of the record convinces us there was no substantial competent evidence that restitution in whole or in significant part was ever a realistic possibility in this case.

At the July 3, 2018 sentencing hearing, Morley testified that in 2017 his estimated gross income was under $50,000. In 2016, he estimated his income at $10,000 to $12,000. In our opinion, given Morley's age (64 years old), which necessarily limits his future work life, his extremely limited income, and pending bankruptcy proceedings—in addition to the substantial restitution owed—it is understatement to observe that there was considerable evidence to support the inference that Morley had no real financial ability to make restitution for all or a substantial part of the actual losses incurred by the victims.

16

On the other hand, had Morley proposed a workable restitution plan it may have constituted some evidence to support Morley's claim of acceptance of responsibility. Yet, no plan was offered, and at the time the dispositional departure decision was made by the district court, there was scant evidence that, under the circumstances, Morley's verbal assurances that restitution would be forthcoming had any basis in fact.

All things considered, we are not persuaded that Morley's agreement to pay restitution as directed by the district court was substantial competent evidence to prove the mitigating factor that the defendant accepted responsibility for his crimes.

In summary, we have reviewed the entire record for substantial competent evidence in support of the district court's conclusion that Morley accepted responsibility for his criminal conduct by pleading no contest and agreeing to pay restitution as ordered by the court. We hold the district court erred in finding there was a sufficient factual basis to support this valid, nonstatutory mitigating factor.

WAS THERE A SUBSTANTIAL AND COMPELLING
REASON TO SUPPORT A DISPOSITIONAL DEPARTURE?

Although our holding in the first issue is determinative of the appeal, the State has raised a second issue which, in our estimation, is appropriate for our consideration. For the sake of completeness, we will review—*assuming* there was substantial competent evidence to support the mitigating factor that Morley accepted responsibility for his criminal conduct—whether the district court abused its discretion when it concluded that this mitigating factor constituted a substantial and compelling reason to depart in this particular case. See *Bird*, 298 Kan. at 398.

17

Kansas law provides:

"Whether the factors relied upon by the sentencing court constitute substantial and compelling reasons for departure from the sentencing guidelines is a question of law with no deference given to the sentencing court. The term 'substantial' refers to something that is real, not imagined; something with substance and not ephemeral. The term 'compelling' implies that the court is forced, by the facts of a case, to leave the status quo or go beyond what is ordinary. The question is whether the departure factors, as a whole, are substantial and compelling reasons for imposing a departure sentence in light of the offense of conviction, the defendant's criminal history, and the purposes of the sentencing guidelines. The analysis of this question is twofold: first, whether a particular reason given by the sentencing court is a valid departure factor and, second, whether the reasons, as a whole, are substantial and compelling reasons for departure in a given case."

"Reasons which may in one case justify a departure, may not in all cases justify a departure. Rather, the inquiry must evaluate the crime and the departure factors as a whole to determine whether departure in a particular case is justified. It is a question of what weight to give each reason stated and what weight to give the reasons as a whole in light of the offense of conviction and the defendant's criminal history. The inquiry also considers the purposes and principles of the Kansas Sentencing Guidelines." *State v. McKay*, 271 Kan. 725, Syl. ¶¶ 2-3, 26 P.3d 58 (2001).

We will determine whether the district court erred in its dispositional departure decision by evaluating the offenses of conviction, the defendant's criminal history, the departure reason stated, and the purposes and principles of the KSGA. *State v. Martin*, 285 Kan. 735, 744, 175 P.3d 832 (2008); *McKay*, 271 Kan. 725, Syl. ¶ 3; *Theurer*, 50 Kan. App. 2d at 1237.

*Offenses of Conviction*

At the outset, we must first assess the offenses of conviction. Morley was convicted of one count of securities fraud, a severity level 4 nonperson felony, and one

count of acting as an unregistered issuer agent, a severity level 5 nonperson felony. The district court determined that the punishment for both convictions was presumptive prison, while noting that acting as an unregistered issuer agent was listed as a border box offense on the sentencing grid.

Importantly, the district court also ruled that Morley's convictions were subject to a special statutory rule which provides that the punishment for any violation of the KUSA shall be presumed imprisonment if the violation resulted in a loss of $25,000 or more. See K.S.A. 2018 Supp. 17-12a508(a)(5). At sentencing, Morley's counsel agreed that this special rule was applicable in this case. By enacting this special rule, the Kansas Legislature statutorily mandated that securities act violations resulting in substantial losses—as in this case—are presumptively punishable by imprisonment.

Next, we consider the offenses of conviction with particular emphasis on the effect of these securities violations on the victimized investors. This review is mandated because the Kansas Legislature has emphasized the importance of the district court considering the views of crime victims in downward departure hearings. In particular, K.S.A. 2018 Supp. 21-6817(a)(1) provides that at any hearing to consider imposition of a downward departure sentence upon a felony conviction, a victim of the offense "may submit written arguments to the court prior to the date of the hearing and may make oral arguments before the court at the hearing." See also Article 15, § 15(a) of the Kansas Constitution (2018 Supp.) ("Victims of crime, as defined by law, shall be entitled to certain basic rights, including the right to be informed of and to be present at public hearings, as defined by law, of the criminal justice process, and to be heard at sentencing or at any other time deemed appropriate by the court, to the extent that these rights do not interfere with the constitutional or statutory rights of the accused.").

At the sentencing hearing, the State argued, "The victims have no illusion that they are going to get one dime back from Mr. Morley and as they have clearly indicated in

19

their victim statements to you and as they will clearly indicate, *they are asking for prison* and it is the appropriate punishment." (Emphasis added.) The written victim impact statements are not included in the record on appeal but three victims addressed the district court describing how Morley's criminal conduct adversely affected them.

One of the investors, B.A., lost $352,500, which was an inheritance from his parents. He told the district court:

"I . . . think I have a lot to say here. It's tough already. I hope I get through it. I mean, this brings up a lot of emotions. The anger, I'm okay with that. I've dealt with anger, you know, my whole life. It's what I can deal with. The depression, you know, that's hard to deal with. The humiliation, I'm embarrassed about all this. I heard mention that [Morley's] family wasn't here. They were embarrassed of him. Well, I didn't invite my family because I'm embarrassed. I'm embarrassed of what I've done here.

"A little bit about my parents. I mean, they were just simple, hardworking people. They were frugal all their lives. My mom shopped at Aldi's for groceries. She shopped at Salvation Army for clothes. I didn't have a clue they were millionaires. My dad drove an old Chevy truck and mom, just a little Chrysler. Nothing special. Like I said, we didn't have any idea of this until the funeral. They didn't eat out, they didn't go on trips. Occasionally went to play golf with some friends.

"My relationship with them hasn't always been great. I had a lot of drug and alcohol problems. I'm sure they wouldn't have trusted me with this kind of money until I got cleaned up and got to the point that they could trust me with something like that, and what happened in two years? I blew it. I wasn't planning on using it for really selfish things. I did buy a house. I lived in a house with just wood heat. We hauled water. Have a young girl and a wife. We bought a house a little closer to town. We have heat and water and at night, they really like it.

"Her college, she's 15 now, sophomore this year. Talks a lot about the college visits that she wants to do. I haven't been able to tell her that I blew her college fund. I blew it in two years. It's gone. You know, that day is coming. Retirement, I don't really care about that right now. I'd spend my retirement to get her into any college she wants to go to any day.

. . . .

20

"I know Maryland, Maryland gave [Morley] a slap on the wrist. Didn't really stop anything. They let you come here, find some easier victims, bigger suckers, whichever it is. Now you want to ask for less restitution and departure. I don't think this is about you now, I think it's about us trying to get back what you took. I think it's about the people of this state getting justice, teaching you and others like you a lesson in not to come here, you know. Welcome to Kansas, Mr. Morley. That's all."

Another victim, D.R., told the district court:

"Naturally, when you own $120,000, and I'm speaking for my sister back here too, $120,000 myself, and my sister, $150,000, and someone steals that from you, it creates a hardship as you are unable to live a lifestyle this money affords. We all think along those lines. That $270,000 is a lot of money to [me] and my sister and as [B.A.] said, we are common people. That's a ton of money. This is money my mother saved from the sale of our farm. Even after she remarried after the death of my father, she earmarked this, willed this to us . . . .

. . . .

". . . Ronald Morley was sanctioned back in Maryland in 2006 for selling unregistered stock as he also did here in Kansas. Apparently, he wasn't punished for this first offense which enabled him to take advantage of us.

"Criminals, if punished correctly, are unable to commit the same crime if incarcerated. . . .

"But I want to have faith in our judicial system. I sincerely request all full restitution and appropriate prison time as well. My sister is 73, and myself soon to be 72. We are at the age where the monies we had would have greatly improved our lives as we both still work to compensate our Social Security. . . ."

Finally, D.R.'s wife and sister-in-law of a third victim, L.H., informed the district court, "And it appears that this is [an] habitual crime with you, Mr. Morley. I learned about your sanction in 2006. . . . [Y]ou are a repeat offender. Justice needs to be served this time so there can be no more repeats of these actions by you."

21

In response to the victims' statements, Morley expressed his remorse:

"To the victims, I regret that you're experiencing what you're experiencing. I serve the same God as you do . . . and I hope you can find forgiveness in your heart. I understand your reasons for upsetness [sic] and I understand the things that [have] caused each family, not only from hearing it, knowing others in Maryland and across the country that have known that."

From the statements of B.A., D.R., and his wife, four important facts are apparent. First, as a direct result of the crimes perpetrated by Morley, individuals who were unfamiliar with and uninformed about investing lost a substantial amount of money. Moreover, as the district judge evaluated the evidence, Morley played a critical role in causing the investment losses:

"[T]he hardworking people of Kansas that are the victims of this case, had they heard, . . .[']by the way, I've been disciplined by the state of Maryland before but don't worry, I'm okay, trust me,['] I think they might have pulled back . . . . The omissions, the other issues that were not disclosed, I think clearly Mr. Morley was a good-sized cog in that wheel that could have been stopped . . . ."

Second, given their limited personal income and age, the investors' loss of substantial sums is adversely impacting their lives. Third, the deceptively obtained funds originated from the victims' parents or relatives who had apparently sacrificed financially in order to provide their children with inheritances. Fourth, while specifically articulated by D.R., and implied by B.A. and D.R.'s wife, these victims expressed their opposition to durational departure sentences.

All things considered, given the myriad ways that securities violations can impact investors, the evidence presented and the victims' statements clearly and convincingly proved that the offenses of conviction in this specific criminal litigation were very serious

22

and caused considerable harm to the victims. The particular facts of this securities case weigh against departing from the presumptive sentences of imprisonment.

*The Defendant's Criminal History*

Next, we consider Morley's criminal history. Prior to sentencing, a presentence investigative report was prepared which indicated that Morley had never been convicted of a crime. During the sentencing hearing, however, Morley testified that in the 1980s he had "a bad check conviction." It does not appear that this conviction was included in Morley's criminal history for sentencing purposes.

More importantly, there was evidence of prior wrongdoing by Morley—similar to the case on appeal—that culminated in a September 2006 consent order issued by the Maryland Securities Commissioner. This order was admitted as an exhibit during the sentencing hearing. The consent order permanently barred Morley from the securities and investment advisory business in Maryland. According to Morley, about three years prior to the issuance of the consent order he began to offer "real estate contracts on timeshares and rental income on properties in Cancun, Mexico." These contracts were offered to investors who "would buy the right for rental income off the timeshare on a weekly basis. They could own one week or all 52 weeks." At that time—as in the case on appeal— Morley was not licensed to sell securities, and the State of Maryland determined the contracts were, in fact, securities.

According to Morley, as part of the consent order he "paid back 100 percent of the amounts of monies [he] made, plus a civil fine and subsequent litigation later on the national level." Morley began making payments as required under the consent order in 2008 and, according to his testimony, paid off his obligations under the consent order in 2009. In this regard, we take special note that Morley's financial obligations under the

23

consent order were apparently paid off within two years after he started earning commissions as a result of the Summit stock offering in late 2007 and 2008.

The district court observed that Morley's conduct with regard to the timeshare securities offering was "a prior bad act, if you want to call it that, but it is not something that is based for criminal history purposes because it was an administrative proceeding." Still, the district court referred to Morley as a "repeat offender" because of the similarity between the 2006 timeshare offering and the Summit stock offering—both cases wherein Morley, without the appropriate licensure, facilitated the sales of securities which resulted in sizable investor losses.

We agree with the district court that Morley's conduct in the 2006 timeshare offering—similar to a prior crime—is a prior civil wrong or prior bad act. Moreover, this conduct—a mirror-image of Morley's current wrongdoing—is a relevant and material factor to consider in the determination of whether a dispositional departure was appropriate in this case. We are persuaded that this particular factor weighs against departing from the presumptive sentences of imprisonment.

*The Departure Reason Stated*

Next, we consider whether the specific mitigating factor relied on by the district court justified imposition of the dispositional departure sentences. Upon our review of Kansas caselaw, this case is unusual because the district court, after considering other factors submitted by Morley as grounds for his departure motion, found only one factor supported the dispositional departure—acceptance of responsibility.

We are unaware of any case wherein a Kansas appellate court has held that the sole nonstatutory factor—that the defendant accepted responsibility for the crime—was a sufficient basis for a dispositional departure. But see *State v. Bell*, No. 118,260, 2018 WL

24

4655525 (Kan. App. 2018) (unpublished opinion) (acceptance of responsibility upon guilty plea warranted a *durational* departure, but not to the extent the defendant requested); *State v. Gunn*, No. 118,108, 2018 WL 1770286, at *3 (Kan. App. 2018) (unpublished opinion) (Upon defendant's guilty pleas in *durational* departure case, district court found several mitigating factors applied, and on appeal our court said, "Both parties concede Gunn's acceptance of responsibility and remorse can stand alone as a substantial and compelling reason for a departure.").

On the other hand, in another of our court's unpublished opinions, *State v. Hill*, No. 117,288, 2017 WL 4321288, at *3 (Kan. App. 2017) (unpublished opinion), we expressed doubt in dicta in a *dispositional* departure case regarding whether acceptance of responsibility could ever be a "stand-alone basis" for departure. We observed, "[i]f it were so, every guilty plea, even those based on a favorable plea agreement, would constitute a basis to depart. Nevertheless, this factor, when combined with other mitigating factors, could constitute a substantial and compelling reason to depart." 2017 WL 4321288, at *3.

We are not persuaded to adopt a blanket rule holding that a defendant's acceptance of responsibility, standing alone, may never provide a substantial and compelling reason to grant a dispositional departure sentence. Indeed, our Supreme Court has stated as a general proposition: "When even one factor relied upon by the sentencing court is substantial and compelling, the departure sentence should be upheld." *Bird*, 298 Kan. at 398. Moreover, the proper inquiry belies bright lines because it is fact-intensive: "Reasons which may in one case justify departure may not in all cases justify a departure." *Theurer*, 50 Kan. App. 2d 1203, Syl. ¶ 7.

Still, under the unique facts relied on by the district court as undergirding Morley's acceptance of responsibility, we are persuaded that this particular mitigating factor does not provide a substantial and compelling basis to warrant the granting of dispositional

25

departure sentences in this case. First, Morley's no contest pleas were not an admission of guilt and they were at least partially motivated by his self-interest in obtaining a favorable plea agreement. Second, Morley's "agreement" to pay restitution was insubstantial given that Kansas law ordinarily requires convicted criminals to pay restitution. Third, Morley's focus on limiting restitution to $50,154, the amount he earned as a result of his wrongdoing rather than the victims' substantial loses is hardly compelling. Fourth, Morley's very limited income and poor financial status coupled with his failure to submit a workable restitution plan undercut his ability to actually accept responsibility by making the victims whole. In sum, assuming there was substantial competent evidence to support this particular factor, we conclude it would not weigh in favor of granting a dispositional departure under the circumstances.

*The Purposes and Principles of the KSGA*

Finally, in evaluating the sentencing court's departure decision, we must consider whether the purposes and principles of the KSGA justify departure in this case. See *Martin*, 285 Kan. at 744 (listing purposes and principles). In the present case, the district court did not specifically reference these purposes or principles in arriving at its departure decision.

One of the principal objectives of the KSGA is that imprisonment should be reserved for serious offenders. Another important objective is that the degree of sanctions imposed should be based on the harm inflicted. See *McKay*, 271 Kan. at 730. While these two objectives represent a general legislative purpose, K.S.A. 2018 Supp. 17-12a508(a)(5) provides a specific statutory imperative that any violation of the KUSA shall be presumed imprisonment if the violation resulted in a loss of $25,000 or more. Read *in pari materia*, the Legislature has statutorily established that a defendant whose criminal conduct in a securities case results in a loss of $845,900 is a serious offender who has caused significant harm and is deserving of incarceration.

26

Finally, another one of the purposes of the KSGA is to insure uniformity in sentencing. As a result, "'departures should only be allowed in extraordinary cases.'" *State v. Brown*, 305 Kan. 674, 697, 387 P.3d 835 (2017) (quoting *State v. Eisele*, 262 Kan. 80, 90, 936 P.2d 742 [1997]). As we have detailed in this opinion, the totality of mitigating circumstances in this case are not extraordinary and, therefore, the presumptive prison sentences ordinarily applied in this type of securities case should be imposed.

In summary, departure reasons must be substantial and compelling given the unique circumstances of an individual case. Having considered the offenses of conviction, Morley's criminal history, the sole mitigating factor of acceptance of responsibility, and the purposes and principles of the KSGA, we hold that—assuming there was substantial competent evidence of Morley's acceptance of responsibility—the district court erred in its legal conclusion that this nonstatutory factor justified the granting of dispositional departure sentences in this case. Under the totality of circumstances, Morley's acceptance of responsibility was not real or substantial, and it was not compelling such that the district court was forced by the case facts to abandon the status quo and venture beyond the sentence that it would ordinarily impose. See *State v. Hines*, 296 Kan. 608, Syl. ¶ 5, 294 P.3d 270 (2013).

The judgment of the sentencing court is reversed, the sentences are vacated, and the case is remanded to the district court for resentencing.